**Louis O. ACEVEDO, III, and Karen Nunnery, Plaintiffs,**

v.

**Dr. Richard C. SURLES, Ph.D., in his official capacity as Commissioner of the New York State Office of Mental Health, Defendant.**

No. 89 Civ. 6257 (RJW).

United States District Court, S.D. New York.

Nov. 18, 1991.

William M. Brooks, Mental Disability Law Clinic, Touro College, Huntington, N.Y., for plaintiffs.

Robert Abrams, Atty. Gen., New York City (Thomas P. Dorsey, Asst. Atty. Gen., of counsel), for defendant.

## OPINION

ROBERT J. WARD, District Judge.

Plaintiffs Louis O. Acevedo, III and Karen Nunnery have moved, pursuant to Rule 56, Fed.R.Civ.P., for summary judgment in the above-captioned action. Defendant Richard C. Surles, Ph.D., has cross-moved for summary judgment. For the reasons that follow, plaintiffs' motion is granted and defendant's motion is denied.

## BACKGROUND

The instant cross-motions for summary judgment are made upon a set of stipulated facts. Those facts which are relevant to the legal questions involved are as follows:

*Plaintiff Acevedo*

Acevedo is an indigent individual who resides at Middletown Psychiatric Center, a psychiatric facility operated by the New York State Office of Mental Health (OMH). On January 3, 1986, Acevedo suffered a broken leg during an assault by another patient on the ward where both patients lived. In March, 1987, as a result of this incident, Acevedo filed a negligence claim against the State of New York ("the State") in the New York State Court of Claims. In December, 1987, the State served upon Acevedo a verified claim for $265,647.66, as a lien against any recovery which might be obtained by Acevedo in the state court proceeding. This amount represented the full cost of charges assessed against Acevedo for his hospitalization and treatment. New York State Assistant Attorney General Kenneth Keutman told Acevedo's counsel that "he should be aware that the verified claim would serve as a lien against any recovery before he spent a great deal of time in processing the claim." Joint Stipulation of Facts at ¶ 4.

Prior to the filing of his negligence claim, the State did not bill Acevedo for the

full cost of his hospitalization. Because Acevedo's assets were limited to Social Security benefits and a small bank account, he would not have been assessed full charges if he had not filed a lawsuit against the State in state court. Joint Stipulation of Facts at ¶¶ 7–8.

In the Court of Claims, Acevedo moved to challenge the validity of the claim assessed against him by the State. The State opposed this motion, arguing that state law imposed a duty upon Acevedo to pay for services provided to him and the Court of Claims lacked jurisdiction to determine the validity of the charges. The Court of Claims denied Acevedo's motion, whereupon Acevedo's attorney recommended to Acevedo that he withdraw his lawsuit, because of the unlikelihood of obtaining any recovery. Acevedo subsequently withdrew his negligence lawsuit against New York. Since then, New York has not attempted to collect the charges-in-full assessed against Acevedo.

*Plaintiff Nunnery*

From September, 1987 until May, 1988, Nunnery resided at the Buffalo Psychiatric Center, a psychiatric facility operated by OMH. In December, 1988, Nunnery filed a lawsuit in the New York State Court of Claims seeking to recover $2,796.00, which she alleged OMH had wrongfully appropriated. In February, 1989, the State served upon Nunnery a verified claim for $128,-835.86. This amount represented charges for care and treatment provided to Nunnery during a number of previous hospitalizations.

Prior to the filing of her lawsuit, the State did not bill Nunnery for the full cost of her hospitalization, because she did not have the ability to pay such costs. If Nunnery had had the ability to pay, New York would have attempted to collect for her costs. OMH told Nunnery that if she withdrew her action in the Court of Claims, then OMH would not attempt to collect the

$128,835.86. OMH did not tell her that it would collect only the amount of any recovery obtained by her against the State.

The serving of a verified claim against Nunnery resulted in her facing a debt far greater than any potential recovery and, for this reason, "she considered withdrawing her lawsuit." Joint Stipulation of Facts at ¶ 25.

*Overview of the OMH Billing Procedure*

While OMH is authorized to assess charges for care and treatment provided to patients,[1] the agency will, with the exceptions noted herein, only assess charges against those patients that OMH believes have the ability to pay such charges or the potential ability to pay. Potential ability means that a patient has known resources, but the extent of the resources are unknown (e.g., when a patient owns a piece of real property but the value of the property is unknown).

In order to determine whether a patient has the ability to pay OMH charges, the agency conducts a financial investigation of each patient upon his or her admission to an OMH facility. Once this investigation is complete, OMH assesses charges commensurate with that patient's ability to pay.[2]

If an OMH patient is entitled to an inheritance, OMH may assess full charges before the patient receives the inheritance.[3] The reason for assessing full charges is to "notify the administrator of the estate that the State has an interest in the proceeding as to ensure that the patient receives his share of the estate and no one attempts to divert funds that belong to the patient." Joint Stipulation of Facts at ¶ 37. Prior to the probate of the estate, other than drafting a verified claim, which may or may not be served on the patient, OMH does not provide a patient with notice that it intends to collect a portion of the inheritance.

However, if a patient receives Social Security or other governmental benefits,

---

1. Pursuant to New York State Mental Hygiene Law § 43.01 *et seq.*

2. For example, if a patient receives Social Security payments in the amount of $300 per month, and has no other assets, OMH will as-

sess charges of approximately $266 per month. Joint Stipulation of Facts at ¶ 31.

3. OMH will exempt from the money it collects a burial fund and a spending allowance.

OMH assesses charges when the patient begins to receive the benefits, rather than when the application is made for such benefits. If OMH learns that a patient is eligible for a lump-sum back payment from the Social Security administration, OMH will assess charges upon receipt of entitlements and not when an application is made. The reason for this policy is that, "OMH does not have the ability to off-set any claims like it does when the patient sues the State." Joint Stipulation of Facts at ¶ 43.

In addition, if OMH learns that a patient or fiduciary acting on the patient's behalf has received funds that can satisfy charges, a bill may be generated commensurate with that patient's ability to pay.

*OMH's Practice Concerning Lawsuits Against the State*

Shortly after a patient files a claim against the State in the New York Court of Claims, OMH will serve a verified claim against the patient in which the patient is assessed full charges for the hospitalization and treatment received in OMH facilities. OMH will not attempt to collect an amount greater than any recovery against the State, unless it learns that the patient has additional assets. However OMH does not tell the patient or patient's attorney that it will collect charges only in the amount of the recovery against the State.

The reason for the OMH policy is, "[b]y notifying the patient and his counsel of the State's ability to set-off, such action saves the time and resources of State staff in defending a lawsuit which would serve no good purpose since the State has the ability to defeat almost any recovery.... In addition, the set-off policy ... avoids the necessity of pursuing claims against parties whom the State Comptroller has already paid and such action was patterned after the practice of general hospitals in personal injury actions." Joint Stipulation of Facts at ¶¶ 51, 53.

**4.** Attorney's fees are calculated by subtracting costs from the gross award to arrive at a net award and then awarding fees as follows:
—one-third of the net award, *or,*
—of the net award,

OMH exempts from its offset, and will pay out on the patient's behalf, allowable costs (including witness fees), attorney's fees[4] and "an amount equal to the maximum Medicaid or SSI reserve as such an amount would be exempt from [OMH] charges under normal circumstances." Joint Stipulation of Facts at Appendix.

A patient cannot challenge a verified claim by OMH in the State Court of Claims because the State does not assert the charges as a counterclaim and thus the Court of Claims lacks jurisdiction to rule on the validity of the set-off. However a patient could challenge the verified claim in New York State Supreme Court by means of an action for declaratory or injunctive relief against the New York State Comptroller. Furthermore, a patient could also challenge a verified claim pursuant to Article 78, New York State Civil Practice Law and Rules. In either case, the burden of proof is on the patient to establish that the charges were incorrect. The State does not provide the patient with notice of the opportunity to challenge the verified claim.

*The Instant Action*

Plaintiffs have filed a motion for summary judgement, asserting that: (1) the State's practice of assessing full charges against plaintiffs in response to their decision to file lawsuits against the State violates the plaintiffs' First Amendment rights of access to the courts and to petition for redress of grievances, as well as 42 U.S.C. § 1983; (2) the State violates the equal protection clause of the Fourteenth Amendment, as well as 42 U.S.C. § 1983, because OMH selectively assesses charges against plaintiffs in response to plaintiffs exercising their First Amendment rights to sue OMH; and (3) the ability of the State to set-off against any judgment obtained by plaintiffs the full care and treatment charges violates plaintiffs' right to due process of law under the Fourteenth Amendment, as well as 42 U.S.C. § 1983.

—50% from $0 to $1,000, plus
—40% of the next $2,000, plus
—35% of the next $22,000, plus
—25% of any amount above $25,000.
Joint Stipulation of Facts at Appendix.

Defendant has filed a cross-motion for summary judgment, claiming that: (1) plaintiffs' rights have not been violated by the State's action of billing them in response to their filing of lawsuits against the State; and (2) plaintiffs' rights have not been violated by the State's ability to set-off its charges against any judgments obtained by plaintiffs. Defendant seeks dismissal of the complaint.

## DISCUSSION

Plaintiffs' complaint challenges two logically distinct OMH policies: (1) when a patient or ex-patient sues the State, OMH files a verified claim against that individual which is based upon the full charges for hospitalization and treatment of the patient or ex-patient, rather than the patient's or ex-patient's ability or potential ability to pay and (2) the State uses a set-off by the State Comptroller, rather than a pre-deprivation hearing, as the means for collecting any verified claim against patients or ex-patients who sue the State. The complaint alleges that the first OMH policy violates the First Amendment and the equal protection clause of the Fourteenth Amendment, and therefore 42 U.S.C. § 1983, while the second OMH policy violates the due process clause of the Fourteenth Amendment, and therefore 42 U.S.C. § 1983.

*Standards for Granting Summary Judgment*

The standards for granting summary judgment in this Circuit are well-established. A court may grant this extraordinary remedy only when it is clear both that no genuine issue of material fact remains to be resolved at trial and that the movant is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. In deciding the motion, the Court is not to resolve disputed issues of fact, but rather, while resolving ambiguities and drawing reasonable inferences against the moving party, to assess whether material factual issues remain for the trier of fact. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106

S.Ct. 2505, 2509–2511, 91 L.Ed.2d 202 (1986)). Only where the entire record would inevitably lead a rational trier of fact to find for the moving party is summary judgment warranted. *National R.R. Passenger Corp. v. City of New York*, 882 F.2d 710 (2d Cir.1989).

While the party seeking summary judgment bears the burden of demonstrating the lack of material factual issues in dispute, *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983), "the mere existence of factual issues—where those issues are not material claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985) (per curiam).

Although the movant faces a difficult burden to succeed, motions for summary judgment, properly employed, permit a court to terminate frivolous claims and defenses, and to concentrate its resources on meritorious litigation. *Knight v. U.S. Fire Ins. Co., supra,* 804 F.2d at 12. Summary judgment then:

> is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed. Rule Civ. Pro. 1.... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

*Plaintiffs' First Amendment Claim*

In order to prove a First Amendment violation and recover under § 1983, plaintiffs must demonstrate that: (1) their actions are protected by the First Amendment, (2) defendant's actions have the effect of chilling plaintiffs' First Amendment

rights, and (3) defendant's actions are motivated by, or substantially caused by, plaintiffs' decision to exercise these rights. If this is demonstrated by plaintiffs, the burden then shifts to the defendant in this case to "show[ ] by a preponderance of the evidence that it would have reached the same decision as to [serving a verified claim on plaintiffs for full treatment costs] even in the absence of the protected conduct." *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

■ The right of access to the courts is guaranteed by the First Amendment right to petition the government for the redress of grievances. *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 2169, 76 L.Ed.2d 277 (1983); *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972); *Easton v. Sundram,* 947 F.2d 1011 at 1015 (2d Cir. 1991).

■ Furthermore, "[t]he Supreme Court has described the right to petition government for redress of grievances as 'among the most precious of the liberties safeguarded by the Bill of Rights.'" *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988) (quoting *United Mine Workers v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967)); *see also, Harrison v. Springdale Water & Sewer Comm'n,* 780 F.2d 1422, 1427 (8th Cir. 1986). In addition, the right of access to the courts is substantive, rather than procedural, and thus "cannot be obstructed, regardless of the procedural means applied." *Morello v. James,* 810 F.2d 344 (2d Cir.1987); *see Franco v. Kelly, supra,* 854 F.2d at 589. Thus, there is no doubt that plaintiffs' right to sue OMH is protected by the First Amendment.

■ The Court will now consider whether OMH's verified claims against Acevedo and Nunnery had the effect of chilling their First Amendment right of access to the courts.

■ It is not enough for Acevedo and Nunnery to prove that OMH sought to chill the plaintiffs from exercising their First Amendment rights. Plaintiffs must also prove that their First Amendment rights were actually chilled. *Davis v. Village Park II Realty Co.,* 578 F.2d 461, 463–64 (2d Cir.1978) (citing *Laird v. Tatum,* 408 U.S. 1, 13–14 n. 7, 92 S.Ct. 2318, 2325–26 n. 7, 33 L.Ed.2d 154 (1972)).

The facts presented in this case indicate that both plaintiffs were chilled in seeking access to the courts. In particular, all parties have stipulated that, after he learned of the State's verified claim, Acevedo, on the advice of his attorney, withdrew from the lawsuit because of the unlikelihood of obtaining any recovery. This was after an assistant attorney general "told [Acevedo's counsel] that he should be aware that the verified claim would serve as a lien against any recovery before he spent a great deal of time in processing the claim." Joint Stipulation of Facts at ¶ 4. The State not only sought to chill Acevedo, but also Acevedo's counsel.

In the case of the other plaintiff, "[t]he serving of a verified claim against Ms. Nunnery resulted in her facing a debt for [sic] greater than any recovery and because of that she considered withdrawing her lawsuit." Joint Stipulation of Facts at ¶ 25. It is not necessary that Nunnery succumb entirely or even partially to OMH's threat so long as she can show that the threat had a chilling effect. *See Harrison v. Springdale Water & Sewer Comm'n, supra,* 780 F.2d at 1428. The fact that she "considered withdrawing" is sufficient to establish that OMH's action had a chilling effect.

Furthermore, OMH was fully aware that its actions chilled the rights of plaintiffs, as well as other patients and ex-patients, from seeking redress in court against OMH. As noted above, all parties stipulated that, "[b]y notifying the patient and his counsel of the State's ability to set-off, such action saves the time and resources of State staff in defending a lawsuit which would serve no good purpose since the State has the ability to defeat almost any recovery." Joint Stipulation of Facts at ¶ 51.

OMH's policy has an especially chilling effect because OMH does not tell the patient that it will collect charges only in the amount of any recovery against the State. For example, while Nunnery sought to recover $2,796.00 in her lawsuit against OMH, the agency filed a verified claim against Nunnery for $128,835.86. Incredibly, OMH did not inform her that it would collect only in the amount of her recovery against the State. Faced with such a large verified claim, and not notified that the State would collect substantially less than $128,835.86, it is hardly surprising that Nunnery felt chilled in pursuing her lawsuit.

Finally, it is incontrovertible that the filing of plaintiffs' suits against OMH was a "substantial factor" or "motivating factor" in OMH's decisions to serve verified claims on plaintiffs for full hospitalization and treatment charges. In Acevedo's and Nunnery's cases, in fact, plaintiffs' suits were the *only* factor in OMH's decisions. Neither plaintiff had received an inheritance, nor new Social Security benefits, nor any other funds which might allow for the payment of previously incurred charges. Thus, none of the other factors that would cause OMH to assess verified charges against defendants were present.

Plaintiffs do not object to OMH's policy of assessing charges against those who inherit assets or receive Social Security payments. However, this does not prevent plaintiffs from prevailing in this suit. " '[A]n act in retaliation for the exercise of a constitutional right is actionable under [s]ection 1983, even if the act, when taken for different reasons, would have been proper.' " *Franco v. Kelly, supra,* 854 F.2d at 590 (quoting *Buise v. Hudkins,* 584 F.2d 223, 229 (7th Cir.1978), *cert. denied,* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979)).

Acevedo and Nunnery have met their burden of showing that: (1) their right to file the original lawsuits for damages against OMH was protected by the First Amendment; (2) OMH's filing of verified claims for the full amount of assessed hospitalization and treatment charges, as a set-off against any recovery, had the effect of chilling plaintiffs' First Amendment rights; and (3) OMH's actions are motivated by, or substantially caused by, plaintiffs' decision to exercise their First Amendment rights.

In order to complete this part of its analysis, the Court must now determine whether OMH has shown by a preponderance of the evidence that it would have served a verified claim on each plaintiff in the absence of each plaintiff's lawsuit against OMH. From the Joint Stipulations of Fact, it is clear that OMH has not made this showing. The parties stipulated that, "Acevedo would not have been assessed full charges if he did not file a lawsuit in state court." Joint Stipulation of Facts ¶ 8. As for Nunnery, the parties have stipulated that, "if she withdrew her Court of Claims action, the OMH would not attempt to collect its bill for $128,835.86." Joint Stipulation of Facts at ¶ 22.

If the OMH practice were to continue, it is highly unlikely that patients or ex-patients would bring civil suits seeking damages for wrongs committed by OMH. Not only might individual patients remain uncompensated, but the public interest would suffer, because less light would be shed on conditions within New York's institutions for mental health. *Cf. Sexton v. Ryan,* 804 F.2d 26, 27 (2d Cir.1986) ("A process whereby an arrestee gives a release to law enforcement authorities of his constitutional claims against them in exchange for their dropping criminal charges against him is inherently suspect because of its potential for use to defeat the public interest in enforcement of our criminal laws and exposure of police misconduct.").

For the reasons stated above, the Court holds that the OMH practice of serving a verified claim for the full amount of hospitalization and treatment costs on those patients who file lawsuits against OMH violates the First Amendment and 42 U.S.C. § 1983.

*Plaintiffs' Equal Protection Claim*

Acevedo and Nunnery claim that the decision by OMH to bill them for the full cost of hospital care in response to the filing of

a damages suit against the State violates the equal protection clause of the Fourteenth Amendment and 42 U.S.C. § 1983. This assertion falls squarely into the broad category of selective prosecution and selective enforcement claims.

■ In order to prevail on a claim of selective criminal prosecution, the person asserting the claim bears the burden of establishing, *prima facie:*

(1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.

*United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir.1974) (citations omitted). This standard also applies to claims of selective investigation by the Internal Revenue Service. *See St. German of Alaska E. Orthodox Catholic Church v. United States,* 840 F.2d 1087, 1095 (2d Cir.1988).

The Second Circuit has used the *Berrios* approach to develop a two-pronged standard for determining whether there is selective enforcement in the civil context. Liability depends on proof that:

(1) the person, compared with others similarly situated, was selectively treated; and (2) ... such selective treatment was based on impermissible considerations such as race, religion, *intent to inhibit or punish the exercise of constitutional rights,* or malicious or bad faith intent to injure a person.

*LeClair v. Saunders,* 627 F.2d 606, 609–10 (2d Cir.1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981) (footnote omitted) (emphasis added).

■ The first prong of this test, as applied to the present matter, revolves around how those who were "similarly situated" were treated by OMH. The appropriate group of those "similarly situated" in this case are other patients or ex-patients who have pursued a course of action (e.g. a lawsuit or a claim for government benefits) which may, at some future date, provide them with assets which would be available to pay OMH claims.

An analogous situation occurs when a patient applies for Social Security or other government benefits. As discussed above, OMH assesses charges against such individuals only after they begin to receive benefits, rather than at the time when the application for benefits was made. If a patient is entitled to a lump-sum back payment of government benefits, OMH assesses charges upon receipt of, rather than application for, the back payment. In either case the assessment is based on the recipient's ability to pay.

These Social Security situations are similar to Acevedo's and Nunnery's cases: an individual seeks to recover from the government assets which could then be used to pay for previous OMH hospitalization and treatment. Yet in the Social Security cases, OMH does not file verified claims for the full cost of charges assessed against the potential beneficiary for that individual's OMH hospitalization and treatment. Furthermore, in the Social Security cases, OMH only assesses charges once patients are in receipt of assets.

OMH seeks to collect hospitalization and treatment charges from those who are able to pay. This is certainly a laudable goal. Yet it is only when patients sue the State for damages that the State assesses charges-in-full prior to the time when patients are in actual receipt of assets. Thus OMH treats this class of patients differently form others who are similarly situated, such as those who receive Social Security benefits or lump-sum payments. For this reason, plaintiffs have met their burden of proof for the first prong of the selective enforcement test.[5]

---

5. OMH may assess charges-in-full when it learns a patient is entitled to receive an inheritance. Plaintiffs do not contend, and this Court does not believe, that such a practice results in an equal protection constitutional violation. In that case, the State is not taking the action

The Court now turns to whether this selective treatment was based on an effort by OMH to inhibit or punish plaintiffs' exercise of their constitutional right of access to the courts. It is clear from defendant's admissions that he did intend to inhibit plaintiffs from seeking damages from OMH. In particular, as indicated above, the parties have stipulated that, "[b]y notifying the patient and his counsel of the State's ability to set-off, such action saves the time and resources of State staff in defending a lawsuit which would serve no good purpose since the State has the ability to defeat almost any recovery." Joint Stipulation of Facts at ¶ 51. Plaintiffs have made the requisite showing that an effort to chill plaintiffs' First Amendment rights was behind the OMH policy that is the focus of this lawsuit.

OMH argues that, "the fact that the bill collector 'goes hunting where the ducks are' cannot be equated with selective prosecution." Defendant's Memorandum of Law in Support of Cross–Motion for Summary Judgment at 8. This may be true, but OMH is shooting only those ducks that have chosen to "quack" by exercising their First Amendment right to sue OMH. This violates the equal protection clause and 42 U.S.C. § 1983.

*Plaintiffs' Due Process Claim*

■ Plaintiffs' final claim is that OMH's use of a set-off policy for collecting on assessed charges fails to give plaintiffs an adequate opportunity to challenge the validity of their hospitalization and treatment bill, thereby denying their right to due process of law under the Fourteenth Amendment and violating 42 U.S.C. § 1983.

Such a claim requires a two-step inquiry: whether Acevedo and Nunnery were deprived of protected interests and, if they were, what process was due. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S.Ct. 1148, 1153, 71 L.Ed.2d 265 (1982).

Both plaintiffs had a significant property interest in their underlying lawsuits against New York. If successful, each would have been entitled to recover damages from the State. Because the State's set-off procedure would reduce or eliminate any recovery that plaintiffs would receive as a result of their lawsuits, this procedure deprives plaintiffs of a constitutionally protected property interest.

In order to determine what process is due under the Constitution, the Court must weigh several factors:

> 'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'

*Zinermon v. Burch*, 494 U.S. 113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100 (1990) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976)).

Due process is a flexible concept, *Signet Constr. Corp. v. Borg*, 775 F.2d 486, 490 (2d Cir.1985) ("[e]xperience teaches that what is fundamentally fair in terms of the form and time of the notice and hearing must of necessity depend on circumstances that will vary from case to case").

Nevertheless, " 'the root requirement of the Due Process Clause' is 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant protected interest.' " *Zinermon v. Burch, supra*, 494 U.S. at 127, 110 S.Ct. at 984 (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985)).

■ There are exceptions to the general rule that a hearing must *precede* any deprivation of a constitutionally protected inter-

---

because of impermissible considerations, e.g., the patient's race, religion or exercise of constitutional rights. Rather, the State's purpose is to "notify the administrator of the estate that the State has an interest in the proceeding as to ensure that the patient receives his share of the estate and no one attempts to divert funds that belong to the patient." Joint Stipulation of Facts at ¶ 37. Such a purpose is constitutionally permissible.

est. In particular, under certain circumstances, a postdeprivation hearing, or a common law tort remedy for erroneous deprivation will provide due process. *Zinermon v. Burch, supra,* 494 U.S. at 128, 110 S.Ct. at 984–85. These exceptions to the general rule fall into two limited categories: (1) cases where a deprivation occurs "as a result of the unauthorized failure of agents of the State to follow established state procedure," *Parratt v. Taylor,* 451 U.S. 527, 543, 101 S.Ct. 1908, 1917, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), thereby making a predeprivation hearing virtually impossible, precisely because the State is not aware that an individual is being deprived of property before the deprivation takes place,[6] *see also Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), and (2) cases where "some exigency ... requires summary action by the state," *Patterson v. Coughlin,* 761 F.2d 886, 892 (2d Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986).

Neither of these exceptions is found in the present case. First, the set-offs against Acevedo and Nunnery are part of an official OMH policy and thus OMH is fully aware that patients are being deprived of property as a result of State action. Unlike a situation where a state employee acts, without authorization, to deprive an individual of property, in the present case the State can always arrange for a predeprivation hearing before the deprivation takes place. Second, no exigencies are presented in the present case which would require summary action by the State. Because the patient will not receive any money from the State unless and until the patient has prevailed in a

lawsuit against the State, OMH would have sufficient time to file a counterclaim and thereby foreclose the patient from being paid.

This Court now turns to the three-part balancing test required by *Zinermon* and *Mathews* to determine whether due process under the Fourteenth Amendment was provided. First, there can be little doubt that the private interest affected by the official action in this case is significant. Because Acevedo is indigent, any non-trivial recovery he receives as a result of his lawsuit against OMH will have a significant impact on his personal financial condition. If OMH is able to set-off against his recovery, Acevedo will remain indigent. While the joint stipulation of facts does not say whether Nunnery is presently indigent or not, it does indicate that she was unable to pay her treatment charges at the time of her hospitalization and that "OMH had no basis for believing that [she] could afford to satisfy the charges in the amount of $128,835.86 when it served the verified claim." Joint Stipulation of Facts at ¶ 26. The Court believes that Nunnery's claim against OMH for $2,796.00, which, if successful, would be set-off, in its entirety, under the current OMH policy, is a non-trivial amount, and therefore represents a significant private interest that is being taken by the State.

The next factor to consider is the risk that the current OMH set-off procedure will result in an "erroneous deprivation" and "the probable value, if any, of additional or substitute procedural safeguards." *Mathews v. Eldridge, supra,* 424 U.S. at 335, 96 S.Ct. at 903. Under the current procedure, there is a risk of error, if only because the patient does not have an oppor-

---

**6.** The facts in *Parratt* demonstrate circumstances under which such an unauthorized failure of state agents to follow established procedures would make a predeprivation hearing "virtually impossible." Parratt, a state prisoner, had ordered certain hobby material by mail. After being delivered to prison, the packages containing the hobby materials were lost, because prison employees did not follow the normal procedure for the receipt of mail packages. Parratt brought an action in federal court, claiming he had been deprived of property without due process of law. In such a situation, the Supreme Court ruled, the state could not be expected to hold a hearing prior to the deprivation, because the State could not possibly have been aware of the deprivation before it occurred. Because of this, a state law postdeprivation tort-claim procedure provided sufficient due process. *Parratt v. Taylor, supra,* 451 U.S. at 543–44, 101 S.Ct. at 1917.

tunity to challenge the accuracy of the bill. There may be a dispute, for example, over the number of days that the patient received treatment and care, or the per diem rate that should be applied to those days. Furthermore, the potential for computer error may add to the overall risk of error. *See Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 18, 98 S.Ct. 1554, 1565, 56 L.Ed.2d 30 (1978) ("[T]he risk of an erroneous deprivation, given the necessary reliance on computers, is not insubstantial." (footnotes omitted)). A predeprivation hearing would allow patients to question and correct any errors made by computers or humans within OMH.

The final factor is the additional burdens that a predeprivation hearing would place on the State. Plaintiffs have argued that, when patients file claims against OMH, the agency could file a counterclaim seeking to recover care and treatment charges in an amount no greater than the amount of recovery sought by the patient. This would certainly provide those who sue OMH with an opportunity to have a predeprivation hearing on whether OMH's assessed charges were accurate, valid and legal. Because OMH would already be involved with litigation against the patient, the incremental time and cost associated with filing a counterclaim would be minimal. The State would only have to establish that the patient received care and treatment for a certain number of days and that the charges imposed were applied correctly. This is not a particularly onerous burden.

The filing of a counterclaim is but one mechanism that the State could use to provide a constitutionally valid predeprivation hearing. Alternatively, the State might establish an administrative procedure for ascertaining whether OMH's assessed charges against those who sue the State are accurate, valid and legal. This Court will not dictate to the State as to exactly what sort of hearing the State must provide. The State may decide how to best provide a predeprivation hearing that comports with the due process clause of the Fourteenth Amendment and satisfies other important state interests, such as minimizing financial and administrative burdens on the State.

New York courts have held that the State's current set-off procedure complies with New York State law, *Carlon v. Regan*, 98 A.D.2d 544, 471 N.Y.S.2d 896 (App. Div.), *aff'd*, 63 N.Y.2d 1011, 484 N.Y.S.2d 506, 473 N.E.2d 734 (1984), and that a patient's remedy for the Comptroller's set-off is a postdeprivation Article 78 proceeding against the Comptroller to review the audit. *Id.* 471 N.Y.S.2d at 898.

Because of this Court's conclusion that an adequate predeprivation hearing is required, a postdeprivation proceeding, such as an action under Article 78 of the New York Civil Practice Law and Rules or an action for declaratory or injunctive relief in New York State Supreme Court, is inadequate, by definition, to meet the due process requirements of the United States Constitution. *Patterson v. Coughlin, supra*, 761 F.2d at 893.

*Defendant's Claims that Current OMH Practices Are Constitutional*

■ The State makes a number of arguments as to why the OMH practices at issue in this case are not unconstitutional. First, the State appears to argue that, because it has chosen to waive its immunity under the Eleventh Amendment of the United States Constitution,[7] the State may limit the right of individuals to avail themselves of their First Amendment access to the federal courts. The State indicates that, "ironically, plaintiffs could not sue the State in this Court as a result of the Eleventh Amendment unless the State waived its immunity." Defendant's Memorandum of Law in Support of Cross–Motion for Summary Judgment at 4. While this statement may be true, once the State has created a cause of action, it is a violation of the First Amendment for a State agency to

---

7. Section 8 of the New York Court of Claims Act provides, "[t]he state hereby waives its immunity from liability and action and hereby assumes liability and consents to have the same determined in accordance with the same rules of law as applied to actions in the supreme court against individuals and corporations...."

chill those parties who seek access to courts, simply because the parties have chosen to pursue such a cause of action.

 Defendant's second argument is that the State does not discourage plaintiffs from suing state employees who plaintiffs believe have wronged them. This assertion may also be true, but it is does not present a principled argument as to why the State should be permitted to chill those who seek to sue the State. The availability of other means of redress, through the courts or otherwise, does not justify the chilling of an individual's First Amendment rights.

The State's third argument concerns plaintiffs' contention that the State intended to chill plaintiffs:

> [The plaintiffs' First Amendment] argument is based upon the novel theory that any attempt by the State to reduce its liability constitutes retaliation and is to be construed as an attempt to chill an adversary's right to access to the courts. In this case that State is a creditor being sued by its debtor. Any creditor in that position would be entitled to press its claim against the debtor.

Defendant's Memorandum of Law in Support of Cross–Motion for Summary Judgment at 4.

The flaw in this assertion is that it ignores the fact that the State is doing more than simply seeking to recover debts owed to the State. If the State were following its general policy, of only seeking to recover debts based on a given patient's ability to pay, the State would seek to recover from Acevedo and Nunnery only in the amounts of their lawsuits against the State. This would be consistent with the general State policy for recovering debts owed to OMH. But the current practice of filing verified claims for amounts far exceeding the amount of the underlying claims for damages against the State can only be viewed as an effort at retaliation against those who sue the State.

The State goes on to argue that a practice of filing counterclaims, as suggested by plaintiffs, would not be much less chilling than OMH's current practice. This argument fails for two reasons. First, there is a vast difference between how a potential plaintiff would react to an OMH counterclaim in the amount of that person's underlying claim for damages against the State and how a potential plaintiff would react to a counterclaim in an amount many times the amount of the underlying claim. For example, a counterclaim against Nunnery for $2,796 is likely to be much less chilling than a counterclaim for over $100,-000, despite the fact that the State would never seek to collect the latter counterclaim in its full amount. Second, under the current State practice allowing set-offs, the plaintiff may not challenge the State's taking prior to deprivation. This, too, serves to chill the likelihood that plaintiff will bring the underlying damage suit against the State.

The State's *fourth* argument is that selective billing makes economic sense, noting that "reimbursement must be sought from those with the resources to pay because to do otherwise would be wasteful." Defendant's Memorandum of Law in Support of Cross–Motion for Summary Judgment at 5. But the State's selective billing procedures are not based solely upon who has the resources to pay. As discussed above, potential Social Security recipients are not assessed charges until *after* they receive benefits or a lump-sum back payment. Other individuals, such as those about to receive an inheritance, are assessed charges based on their ability or potential ability to pay. But this is not the situation with those who sue OMH. In this case, for example, there is absolutely no reason to believe that Acevedo would have had the ability to pay $265,647.66 or that Nunnery would have had the ability to pay $128,835.86 if their lawsuits for damages against the State had been successful.

The State's final argument in support of its cross-motion for summary judgment is that, because: (1) the State waived its immunity under the Eleventh Amendment, (2) such waiver is subject to the Constitution of the State of New York, and (3) state courts have interpreted the New York State Constitution as allowing the State to

set off without a hearing, therefore plaintiffs "could not acquire a property interest in collecting a judgment free of the Comptroller's obligation to audit and set off against it amounts due to the state." Defendant's Memorandum of Law in Support of Cross–Motion for Summary Judgment at 9. The State then argues that, because there is no deprivation of property, no hearing is required by the due process clause of the Fourteenth Amendment.

However, the Eleventh Amendment waiver and the Comptroller's constitutional authority under New York State law to set off are distinct acts. By waiving the Eleventh Amendment in broad terms, *see supra,* footnote 7, the State grants a right to plaintiffs and those similarly situated—a right that confers a property interest on plaintiffs. The Comptroller's set-off may reduce the amount of that property interest and therefore represents a taking by the State. Thus, as discussed in the previous section on plaintiffs' due process claim, a predeprivation hearing is required by the due process clause of the Fourteenth Amendment.

### CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is granted and defendant's cross-motion for summary judgment is denied. The State's policy to bill-in-full all OMH patients or ex-patients who sue the State violates plaintiffs' First Amendment right of access to the courts and Fourteenth Amendment right to equal protection. The State's policy of using a set-off, without any predeprivation hearing, to reduce any award that a patient or ex-patient may receive against the State violates plaintiffs' Fourteenth Amendment right to due process.[8]

Settle judgment on notice.

---

**8.** In the "Relief Requested" section of their First Amended Complaint, plaintiffs request a judgment declaring that the OMH set-off procedure also violates their First Amendment rights. However, this argument is not made explicitly in either the "Legal Allegations" section of the plaintiffs' complaint, nor in the plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment. Therefore, no such relief will be granted at this time in the present case.