**Limoni BROWN, as Administrator of the Estate of Evelyn Hasson, Jed Rothstein, Brian DeMarco and Mental Disability Law Clinic, Touro Law Center, Plaintiffs,**

v.

**James STONE, in his official capacity as Commissioner of the New York State Office of Mental Health, Reginald Glover, personally, and Frank Tinker, Defendants.**

No. 96–CV–1485 (FB).

United States District Court,
E.D. New York.

Aug. 17, 1999.

William M. Brooks, Touro College, Jacob D. Fuchsberg Law Center, Kelly Sprissler, Kenneth Moeller, Nancy Clifford, Law Student Interns, Huntington, NY, for the plaintiffs.

Eliot Spitzer, Attorney General of the State of New York, by Lisa M. Evans, Marion R. Buchbinder, Monica JHA, Assistant Attorneys General, New York City, for the defendants.

## MEMORANDUM AND ORDER

BLOCK, District Judge.

Under New York statutory law, the State of New York ("State") is obliged to provide free care and treatment at its psychiatric hospitals for mentally ill indigents. Accordingly, it will not bill or sue a patient for services rendered unless or until the patient has the ability to pay. If, however, an indigent patient, or an indigent ex-patient, sues the State in the Court of Claims to recover damages for injuries arising out of his or her psychiatric treatment, the State, in the personage of the defendant James Stone, in his official capacity as Commissioner of the New York

State Office of Mental Health ("Commissioner" or "OMH"), has adopted a policy and practice of then assessing full care and treatment charges, and interposing a counterclaim in that lawsuit for payment. The counterclaim is restricted, however, to any sum which the plaintiff may recover. *See* Stipulation of November 11, 1996 ("Stipulation"), ¶¶ 1, 6. In suits brought against an OMH employee in the State Supreme Court or in federal court, OMH does not maintain a policy of assessing full care and treatment charges, since the employee has no personal claim against the plaintiff which could arguably serve as the basis for a counterclaim. Nonetheless, OMH has acknowledged that it has assessed such charges in respect to plaintiffs Limoni Brown ("Brown"), as Administrator of the Estate of Evelyn Hasson ("Hasson"), and Jed Rothstein ("Rothstein"), indigent parties who have sued OMH employees in the State Supreme Court. *Id.* ¶ 2.

The third, and last, amended complaint ("complaint") in this action, brought pursuant to 42 U.S.C. § 1983, challenges the constitutionality of OMH's Court of Claims counterclaim policy, with its attendant assessment of charges. It also challenges the constitutionality of OMH's specific assessment of charges against Brown and Rothstein in response to their State Supreme Court lawsuits. The basis for the constitutional challenges in both respects is that OMH's conduct violates the indigent's rights under the First Amendment and Equal Protection Clause of the Fourteenth Amendment because it has a chilling effect upon the initiation and prosecution of lawsuits against OMH or its employees for patient abuse, and thereby effectively insulates them from civil liability for the violation of patient rights.

Brown and Rothstein seek declaratory and injunctive relief. Rothstein also seeks to hold the individual defendants, Reginald Glover ("Glover"), the Director of OMH's Bureau of Patient Resources, and Frank Tinker ("Tinker"), the former Director of the Attorney General Liaison Unit of OMH, personally accountable in damages because they allegedly were responsible for the assessment of full care and treatment charges when Rothstein brought his State Supreme Court lawsuit. Finally, the complaint seeks a declaration that OMH is preempted under federal statutory law from reaching any sums which any patient or former patient, whether or not indigent, may recover against OMH or its employees in any litigation emanating from the patient's maltreatment.

Plaintiff Mental Disability Law Clinic, Touro Law Center ("Clinic"), has joined the litigation in support of all of the individual plaintiffs' claims, and also sues on its own behalf.

Glover and Tinker have moved under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP") to dismiss Rothstein's damage claims on the ground of qualified immunity. Defendants have moved to dismiss the balance of the complaint under FRCP 12(b)(6) for failure to state any cognizable claim. They have also moved, pursuant to FRCP 12(b)(1), to dismiss an ill-defined claim by plaintiff Brian DeMarco ("DeMarco") for lack of standing, and have separately questioned whether the Clinic has standing. *See* Stipulation ¶ 9.

The Court concludes that the constitutionality of OMH's counterclaim policy and the interrelated assessment of charges in respect thereto, is not properly before the Court, since the counterclaim would be contingent on the success of an indigent plaintiff's litigation in the Court of Claims and, as a matter of State law, contingent counterclaims are prohibited; that Brown and Rothstein have alleged cognizable constitutional challenges under the First Amendment and Equal Protection Clause of the Fourteenth Amendment to the alleged assessment of full care and treatment charges by OMH in retaliation for lawsuits brought by these plaintiffs against OMH employees in the State Supreme Court; that OMH is not preempted from seeking payment for its treatment and

care costs from the proceeds of damage awards recovered by patients or former patients in litigation brought against OMH or its employees; and that Glover and Tinker are not now entitled to qualified immunity. In respect to the standing issues, the Court holds that DeMarco lacks standing, but that the Clinic has standing to sue both on behalf of the remaining plaintiffs, as well as on its own behalf.

## I. BACKGROUND

### A. The Parties

In the parties' Stipulation, which was "So Ordered" by the Court on November 21, 1996, they agreed, *inter alia,* that the challenge to OMH's Court of Claims counterclaim policy, and its concomitant assessment of charges in respect thereto, may be maintained as a class action by plaintiff Brown on behalf of Hasson's estate, and that the class consists of all those, such as Hasson, or her estate, who "(1) have resided, presently reside, or will reside in facilities operated by OMH and (2) have pending Court of Claims proceedings or intend to commence such proceedings in the future against OMH to compensate alleged injuries suffered in OMH facilities." Stipulation ¶ 5.

As alleged in the complaint: Hasson was a former patient in an OMH facility. She died because of Thorazine toxicity, which was caused by over-medication prescribed by OMH physicians while she was a patient in the facility. Consequently, on July 6, 1995, Brown brought suit on behalf of the deceased against OMH in the Court of Claims. Shortly thereafter, Brown also initiated a separate lawsuit in the State Supreme Court against the physicians and another individual who were responsible for the harm visited upon Hasson. Subsequent to the filing of these lawsuits, OMH assessed charges-in-full for the treatment provided to Hasson during her hospital confinement, in the amount of $220,136.90, and counterclaims were thereafter interposed in each lawsuit in that sum. Although the counterclaim in the Supreme

Court action was later withdrawn because the individual defendants in that lawsuit did not have a claim against the deceased, the assessment of charges and OMH's counterclaim in the Court of Claims perdured. Hasson had always been indigent, and her estate could not satisfy the charges. As a result of the assessment of full charges, which Brown believed to be designed by OMH "to discourage patients or former patients from bringing lawsuits against the State and its employees," Complaint ¶ 62, Brown considered withdrawing both lawsuits.

Rothstein alleges in the complaint: He was a patient in an OMH facility and filed suit in State Supreme Court against the facility's director and his treating physician for damages under federal and state law because he was forcibly medicated against his will during his hospital confinement. After commencing the suit, OMH assessed full care and treatment charges against him in the amount of $24,760.14, and also informed him that he would be responsible for the payment of outpatient services rendered by OMH. Rothstein thereafter received a letter from the State's Department of Law notifying him that if he did not arrange payment within twenty-one days, a lawsuit would be commenced against him seeking such sum, together with interest and court costs. He did not pay because he was indigent, but seriously considered discontinuing his lawsuit, with prejudice, because OMH advised him that if he did, OMH would withdraw its assessment of charges. OMH has yet to sue him; nor has it advised him that it will withdraw its assessment.

Rothstein alleges that this conduct by OMH had previously been declared unconstitutional by the District Court for the Southern District of New York in *Acevedo v. Surles,* 778 F.Supp. 179 (S.D.N.Y.1991), where that court held that "[t]he State's policy to bill-in-full all OMH patients or ex-patients who sue the State violates plaintiffs' First Amendment right of access

to the courts and Fourteenth Amendment right to equal protection." Complaint ¶ 89 (quoting *Acevedo*, 778 F.Supp. at 191). Consequently, Rothstein seeks to hold Glover and Tinker accountable in damages because these defendants knew, or should have known, that OMH had represented to the court in *Acevedo* that it would abide by the court's decision, but nonetheless Glover "decided to continue the policy of assessing charges-in-full against patients or former patients in OMH operated facilities who decide to file lawsuits," Complaint ¶ 90, and Tinker implemented this policy by assessing the charges against Rothstein.

As alleged in the complaint, DeMarco was a patient in an OMH facility who previously had filed suit in federal court pursuant to 42 U.S.C. § 1983 against OMH physicians because they allegedly inappropriately authorized his involuntary hospitalization. DeMarco does not allege that he ever was indigent or that he ever was billed by OMH for his hospital treatment; and there are no discernable claims asserted on his behalf against any of the defendants.

According to the complaint, the Clinic is a Protection and Advocacy agency which, pursuant to the Protection and Advocacy for Mentally Ill Individuals Act of 1986 ("PAMII"), 42 U.S.C. § 10801 *et seq.*, "is authorized to, *inter alia*, pursue legal remedies on behalf of institutionalized individuals who suffer from mental illness and provide legal representation to such individuals." Complaint ¶ 108. Accordingly, the Clinic has brought many damage actions for such individuals "to facilitate compliance with patients' legal rights by the OMH and other governmental entities." *Id.* ¶ 116. In addition to representing the individual plaintiffs in this litigation, in the personage of the Clinic's attorney, William M. Brooks ("Brooks"), it sues on its own behalf for declaratory and injunctive relief because of the drain on its limited resources occasioned by OMH's alleged repeated systemic violations, "which dimin-

ish[es] the ability of the Clinic to provide services to other individuals who require assistance." *Id.* ¶ 115.

## B. State Statutory Provisions

The State has provided in various provisions of its Mental Hygiene Law for a statutory scheme that requires all patients who can afford to pay for mental health treatment be charged for services rendered, and vests in the Commissioner the authority to provide for billing and collection. The relevant statutory provisions provide:

**43.01 Fees and rates for department services**

(a) The department shall charge fees for its services to patients and residents, provided, however, that no person shall be denied services because of inability or failure to pay a fee.

(b) The commissioner may establish, at least annually, schedules of rates for inpatient services that reflect the costs of services, care, treatment, maintenance, overhead, and administration which assure maximum recovery of such costs.

**43.03 Liability for fees**

(a) The patient, his estate, his spouse, his parent, or his legal guardian if he is under twenty-one years of age, and his committee and any fiduciary or representative payee holding assets for him or on his behalf are jointly and severally liable for the fees for services rendered to the patient. Parents or spouses of parents are not liable for the fees rendered to a disabled child under twenty-one years of age, who does not share the common household even if the child returns to the common household for periodic visits.

(b) The commissioner may reduce or waive fees in cases of inability to pay or other reason. If the commissioner discovers that assets existing at the time of determination were not disclosed because of fraud or negligence, the depart-

ment may collect the difference between the amount paid and the actual cost of services. The acceptance of less than the full fee or the waiver of a fee or any part thereof shall not be construed to release a patient, his estate, committee or guardian, the trustee of a fund established for his support, or any fiduciary or payee of funds for or on behalf of a patient from liability for payment of the full fee.

### 43.07 Bill collection procedures

(a) The commissioner may enter into agreements with the patient or a person liable for him pursuant to this chapter to assure the regular payment of fees.

(b) The commissioner may collect bills not paid within sixty days of presentment or pursuant to an agreement by the enforcement of liens, the initiation of suit against liable parties to recover amounts due, or the initiation of suit to enforce an agreement.

(c) An action to collect fees due pursuant to this chapter shall commence within six years from the accrual of the cause of action. This cause of action accrues when the fees become due.

### C. The *Acevedo* and *Siegel* Litigations

As referenced in the complaint, the issue of the constitutionality of OMH's assessment of full charges against indigent patients or indigent former patients suing OMH or its employees was the subject of litigation in the District Court for the Southern District of New York in *Acevedo v. Surles.* Prior to *Acevedo,* OMH had established a two-part policy when it was sued by an indigent patient or indigent ex-patient: First, OMH sent the plaintiff a verified claim for all unbilled charges; second, if the plaintiff was successful in damages against OMH, the State Comptroller would simply offset the claim against the plaintiff's judgment.[1] In *Acevedo,* plaintiffs successfully challenged each of these practices. As in the present case, they were represented by Brooks on behalf of the Clinic.

Acevedo, who was one of the two plaintiffs in that case, was an indigent patient who had brought a negligence case against OMH in the Court of Claims. In turn, OMH, which had not previously assessed charges against him because of his indigency, filed a verified claim for $265,-647.66, and OMH's counsel advised Acevedo's lawyer that "he should be aware that the verified claim would serve as a lien against any recovery before he spent a great deal of time in processing the claim." *Acevedo,* 778 F.Supp. at 180 (quotation and citation omitted). Acevedo withdrew his lawsuit after being advised by his attorney of the unlikelihood of obtaining any recovery. The other plaintiff in *Acevedo* was an indigent ex-patient who brought a Court of Claims lawsuit against OMH for a relatively small sum of money which she claimed OMH had wrongfully appropriated, only to be met in turn with a significantly larger verified claim for care and treatment provided during a number of previous hospitalizations. OMH told this plaintiff that it would not attempt to collect this large sum if the lawsuit was withdrawn. Since she was facing a debt far greater than any potential recovery, she considered dropping her case. In granting summary judgment to both plaintiffs, the court concluded:

> The State's policy to bill-in-full all OMH patients or ex-patients who sue the State violates plaintiffs' First Amendment right of access to the courts and Fourteenth Amendment right to equal protection. The State's policy of using a set-off, without any predeprivation hearing, to reduce any award that a patient or ex-patient may receive against the State violates plaintiffs' Fourteenth Amendment right to due process.

*Acevedo,* 778 F.Supp. at 191.

In regard to the First Amendment, the court reasoned that OMH's conduct was designed to chill plaintiffs' constitutional

---

1. The offset would not include the plaintiff's attorney's fee and allowable costs.

right of access to the courts and to petition the government for redress of grievances. Notably, in response to OMH's argument that it was simply acting as a rational creditor, the court observed that "[i]f the State were following its general policy, of only seeking to recover debts based on a given patient's ability to pay, the State would seek to recover from [plaintiffs] only in the amounts of their lawsuits against the State." *Id.* at 190. Since this was not the case, the court concluded that "the current practice of filing verified claims for amounts far exceeding the amount of the underlying claims for damages against the State can only be viewed as an effort at retaliation against those who sue the State." *Id.*

On the Equal Protection issue, the court viewed the plaintiffs as being similarly situated to indigents who apply for Social Security or other government benefits, and concluded that since OMH does not assess charges against such individuals until they begin to receive benefits, rather than at the time when the application for benefits was made, plaintiffs' Equal Protection rights were violated.[2] As for the due process issue, the court held that the State's set-off policy precluded plaintiffs from their entitlement to a predeprivation opportunity to challenge the validity of their hospitalization and treatment bills. Significantly, the court referenced a number of mechanisms that the State could readily employ to provide a constitutionally valid predeprivation hearing, including, as plaintiffs "argued," that "when patients file claims against OMH, the agency could file a counterclaim seeking to recover care and treatment charges in an amount no greater than the amount of recovery sought by the patient." *Id.* at 189.

Taking its cue from the court's rationale and commentary in *Acevedo,* OMH there-

after renounced its verified claim and set-off practice when sued in the Court of Claims, and limited itself to interposing a counterclaim in a sum not to exceed the amount of a plaintiff's recovery. Nevertheless, in *Siegel v. Surles,* Index No. 405319/93, slip op. (N.Y.Sup.Ct., N.Y.County, Mar. 20, 1995), *aff'd without opinion,* 239 A.D.2d 115, 657 N.Y.S.2d 549 (1st Dep't 1997), *appeal dismissed,* 91 N.Y.2d 804, 668 N.Y.S.2d 559, 691 N.E.2d 631 (1997), Acevedo and an otherwise new set of plaintiffs, all represented by Brooks and the Clinic, challenged the constitutionality of this new policy. Preliminarily, the State Supreme Court rejected a *res judicata* and collateral estoppel challenge by OMH because it read the court's constitutional findings in *Acevedo* "to be restricted to the OMH policy of serving verified claims and not counterclaims." *Siegel,* slip op., at 10–11. In addition, it noted that a post-judgment stipulation in *Acevedo* provided that the judgment in that case "did not preclude challenges to any future practice or filing of counterclaims not addressed therein...." *Id.* at 11.

Addressing the merits, the court in *Siegel* had little difficulty disposing of the plaintiffs' constitutional challenges to OMH's new policy. Rejecting plaintiffs' Equal Protection claim, the court believed that the assertion of counterclaims placed plaintiffs on the same conceptual footing as those who receive inheritances or are entitled to Social Security benefits. In regard to the First Amendment, the court concluded that OMH's counterclaim practice sufficiently thawed any constitutional chill because it only sought payment for sums which would never exceed a plaintiff's recovery. Moreover, the counterclaim could not be perceived as a disincentive by OMH employees to safeguard the rights of the State's mental patients in light of the spate

---

2. In respect to inheritances, plaintiffs did not contest, and the court did not find constitutionally impermissible, OMH's policy of assessing full charges when it learns a patient is entitled to receive an inheritance because the State's purpose in that regard is to "notify the

administrator of the estate that the State has an interest in the proceeding as to ensure that the patient receives his share of the estate and no one attempts to divert funds that belong to the patient." *Acevedo,* 778 F.Supp. at 186 n. 5 (quotation and citation omitted).

of statutory and regulatory provisions mandating the monitoring, reporting, investigation and prosecution of incidents of patient abuse and neglect at OMH facilities. As for due process, the court agreed with *Acevedo* that affording a plaintiff the opportunity to challenge the legitimacy of OMH's charges in the course of the lawsuit clearly satisfied predeprivation due process concerns. Finally, the court rejected a new claim—"that as a matter of public policy, awards obtained as a result of tortious conduct by the OMH or its employees are exempt from care and treatment charges," *Siegel,* slip op., at 14—concluding in that regard that "if the Court of Claims were to grant an award to a claimant upon finding OMH negligent on any particular day(s), that should not nullify OHM's claim for charges for all other days on which OMH was not negligent." [3] *Id.* at 14–15. The subsequent summary affirmance of the State Supreme Court's judgment of dismissal by the Appellate Division, and dismissal of the appeal thereafter by the Court of Appeals, ended the *Siegel* litigation.

## D. Procedural Posture and Proposed Issues for Resolution

In their Stipulation, the parties submitted that the issues in this lawsuit are as follows:

> "Whether the OMH practice of assessing full care and treatment charges in response to a lawsuit filed against the OMH in the Court of Claims and using the mechanism of a counterclaim to collect charges for care and treatment up to the full amount of damages sought against it in the Court of Claims by patients or former patients claiming injury as a result of allegedly tortious conduct of OMH employees violates the First Amendment or Equal Protection Clause of the Fourteenth Amendment of [ ] the United States Constitution."

> "Whether the OMH assessment of full charges in response to lawsuits filed by Jed Rothstein and Limoni Brown against OMH employees up to the full amount of damages as a result of allegedly tortious conduct of OMH employees violates the First Amendment or Equal Protection Clause of the Fourteenth Amendment to the United States Constitution."

> "Whether 42 U.S.C. § 1983 preempts the use of a tort award obtained as a result of tortious conduct by the OMH or its employees to satisfy care and treatment charges assessed pursuant to Mental Hygiene Law § 43.01 *et seq.*"

> "Whether 42 U.S.C. § 110801[sic] preempts the use of a tort award obtained as a result of tortious conduct by the OMH or its employees to satisfy care and treatment charges assessed pursuant to Mental Hygiene Law § 43.01 *et seq.*"

> Whether DeMarco and, possibly, the Clinic have standing.

Stipulation ¶¶ 6–9.

After hearing oral argument on defendants' FRCP 12(b)(1) and FRCP 12(b)(6) motions to dismiss, the Court converted that part of the FRCP 12(b)(6) motion seeking dismissal of Brown's claim challenging the constitutionality of OMH's Court of Claims counterclaim, to a summary judgment motion, as authorized under FRCP 12(b)(6). In particular, the Court asked the parties to address whether the counterclaim would be cognizable as a matter of State law. *See* Order of February 20, 1998. The Court raised this issue *sua sponte* to determine whether the constitutional issue regarding the counterclaim need be reached, positing the following question to OMH's counsel:

> Do you think that the issue, before we even get involved in constitutional concerns, might be whether or not there is

---

**3.** Because the court dismissed the complaint, it did not have to pass upon a motion by

plaintiffs for class certification.

a viable counterclaim that can lawfully be asserted in response to the plaintiff's lawsuit? \*\*\* [I]f in fact the law is that \*\*\* your rights do not accrue until a fund is established which would establish the ability to pay, then maybe you don't have the right of a counterclaim at all.

Transcript of Oral Argument ("Tr."), February 6, 1998, at 12. The Court also invited the parties to address any other matter that might be meet for summary disposition.[4]

Thereafter, defendants formally moved for summary judgment pursuant to FRCP 56 on the counterclaim issue. *See* Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Dft.S.J.Mem."), Point I. Defendants also submitted a Statement Pursuant to Rule 56.1 ("Dft.Stmt."), wherein OMH set forth its current policy regarding the billing of indigents and the filing of counterclaims in response to litigation brought in the Court of Claims against OMH by indigent plaintiffs:

> The OMH is statutorily authorized to assess charges and collect for care and treatment provided to patients at its facilities. It only bills patients or their fiduciaries if they are financially able to pay. The OMH does not bill patients it initially determines to be indigent.... However, the OMH makes adjustments in its initial assessment if the financial circumstances of the patient changes.... It might cease billing the patient depending upon the patient's financial situation or it might increase the amount it bills if intervening events concerning a patient's ability to pay come to its attention.
>
> In those cases where the OMH receives notice of a patient's enhanced ability to pay, the OMH strives to protect its rights to obtain reimbursement of costs.

For example, to ensure that it gets preferred creditor status, the office might file a verified claim where it obtains notice that a patient might have inherited an estate.... For the same reasons, the OMH might file a counterclaim in response to a lawsuit brought against it by a patient.

In those instances where the OMH files a counterclaim in lawsuits brought against it by patients or former patients who allege a tortious cause of action against the office, it does not seek to recover costs that are in excess of the patient's treatment rendered in the OMH facility. Furthermore, it notifies these patients that the amount it seeks for recoupment of treatment costs would fall at, or, where applicable, below the patient's recovery.

Dft.Stmt. ¶¶ 3–5 (internal citations omitted).

Defendants also contended, for the first time, that *Siegel* should, by reason of collateral estoppel, bar plaintiffs from relitigating the issue of the constitutionality of OMH's counterclaim policy, *see* Dft. S.J.Mem., Point II, and, furthermore, that abstention should be invoked under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). *See* Dft.S.J.Mem., Point III.

## II. DISCUSSION

### A. Standing Issues

■ Standing issues implicate the Court's jurisdiction under the case or controversy "bedrock requirement" of Article III, section 2 of the United States Constitution. *See Raines v. Byrd*, 521 U.S. 811, 818, 117 S.Ct. 2312, 2317, 138 L.Ed.2d 849 (1997) (citations omitted). This means that there must be a plaintiff who can establish an injury-in-fact, namely, an invasion of a judicially cognizable interest

---

4. In that regard, the Court's order directed the parties to address the issue of "what effect a determination of the cognizability of the State law claims would have on the class action plaintiffs and the individual plaintiffs ... and any other matters that the Court should consider." Order of February 20, 1998, at 2.

causally connected to the conduct complained of that is "likely" to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quotation and citation omitted).

■ The standing inquiry, however, invokes "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (citation omitted). The prudential limitations are "judicially self-imposed limits on the exercise of federal jurisdiction," which "can be modified or abrogated by Congress," *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997) (quotation and citation omitted), and deal with "who is authorized to invoke the courts' decisional and remedial powers." *Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 74 (3d Cir.1998). One such prudential limitation is "the general prohibition on a litigant's raising another person's legal rights." *Family & Children's Ctr., Inc. v. School City of Mishawaka*, 13 F.3d 1052, 1059 (7th Cir. 1994) (citing *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). Since Congress can modify or abrogate prudential limitations, it "may grant an express right of action to those who would otherwise lack standing due to application of the prudential requirements. So long as the Article III minimum requirements are met, a plaintiff may, where Congress directs, have standing to 'seek relief on the basis of the legal rights and interests of others, and ... may invoke the general public interest....'" *Fair Housing Council*, 141 F.3d at 75 (quoting *Warth*, 422 U.S. at 500, 95 S.Ct. 2197) (omission in original).

### 1. DeMarco

■ Standing, like other jurisdictional inquiries, "cannot be inferred argumentatively from averments from the pleadings, but rather must affirmatively appear in the record." *Thompson v. County of Franklin*, 15 F.3d 245, 248 (2d Cir.1994) (quotation and citations omitted). Consequently, "it is the burden of the party who seeks the exercise of jurisdiction in his favor ... clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *Id.* (quotation and citation omitted).

■ Although, "when considering a party's standing," the Court must "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party," *id.* at 249 (quoting *Warth*, 422 U.S. at 501, 95 S.Ct. 2197 (quotation omitted)), it is at once apparent that DeMarco lacks standing since he has not alleged that he ever was an indigent or ever was billed for hospital treatment. In sum, he has simply failed to demonstrate, inadvertently or otherwise, an injury-in-fact.

### 2. Clinic

In respect to the Clinic's standing, the Clinic must demonstrate either its own injury-in-fact, or that Congress has removed the prudential barrier precluding third parties from suing on behalf of others, so that the Clinic may seek relief on the basis of the legal rights and interests of the individual plaintiffs. Notably, "[a]lthough standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal," *id.* (quoting *Warth*, 422 U.S. at 500, 95 S.Ct. 2197 (quotation omitted)), "where, as here, issues of the prudential limitations on standing arise, a plaintiff's standing turns on 'whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief.'" *Id.* (quoting *Warth*, 422 U.S. at 500, 95 S.Ct. 2197). The Clinic contends that it satisfies both standing concepts.

#### a. *Prudential Limitations*

It is undisputed that the Clinic is a duly constituted State-designated PAMII orga-

nization. Congress, in recognition, *inter alia,* that "individuals with mental illness are vulnerable to abuse and serious injury," 42 U.S.C. § 10801(a)(1), authorized the establishment of PAMII organizations, as an integral part of state Protection and Advocacy ("P & A") systems, for, *inter alia,* the following purposes:

> (1) to ensure that the rights of individuals with mental illness are protected; and
>
> (2) to assist States to establish and operate a protection and advocacy system for individuals with mental illness which will—
>
>> (A) protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes;
>> . . .

42 U.S.C. § 10801(b).

Consistent with such purposes, Congress, under subsections B and C of 42 U.S.C. § 10805(a)(1), conferred upon PAMII organizations the authority to:

> (B) pursue administrative, legal and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State; and
>
> (C) pursue administrative, legal, and other remedies on behalf of an individual who
>
>> (i) was a[sic] individual with mental illness; and
>>
>> (ii) is a resident of the State,
>
> but only with respect to matters which occur within 90 days after the date of discharge of such individual from a facility providing care or treatment; . . .

If a PAMII lawsuit does not fall under the umbrella of either subdivision B or C, the PAMII plaintiff would, therefore, be subject to the prudential barrier precluding a litigant from participating in the adjudication of another litigant's legal rights.

Unfortunately, the legislative history "shed[s] no light on the issue of a [PAMII's] standing" under § 10805(a)(1)(B) or

(C). *Rubenstein v. Benedictine Hosp.,* 790 F.Supp. 396, 408 (N.D.N.Y.1992). There are, however, a few cases that have considered prudential standing under these PAMII statutory provisions and their comparable counterparts under other Protection and Advocacy systems. *See, e.g.,* 42 U.S.C. § 6042(a)(2) (P & A system for Individuals with Developmental Disabilities). Invariably, they do not prescind between the two subdivisions, although categorization seems self-evident. Essentially, subdivision B is apparently designed to address systemic issues affecting the rights of multiple individuals. *See, e.g., Alabama Disabilities Prog. v. J.S. Tarwater Dev. Ctr.,* 97 F.3d 492, 494, 496 (11th Cir.1996) (suit to gain access to records of individuals who died while in facility's care); *Township of West Orange v. Whitman,* 8 F.Supp.2d 408, 424–25 (D.N.J. 1998) (intervention to support establishment of group homes); *Trautz v. Weisman,* 846 F.Supp. 1160, 1162 (S.D.N.Y. 1994) (suit to enjoin "filthy, dangerous, and degrading conditions" at facility); *Michigan P & A Serv., Inc. v. Miller,* 849 F.Supp. 1202, 1204 (W.D.Mich.1994) (suit to obtain records and visitation rights); *Michigan P & A Serv., Inc. v. Babin,* 799 F.Supp. 695, 702 n. 12 (E.D.Mich.1992), *aff'd,* 18 F.3d 337 (6th Cir.1994) (conferring standing on PAMII organization to litigate Fair Housing Act case on behalf of individuals suffering from developmental disabilities); *Rubenstein,* 790 F.Supp. at 408–09 (suit seeking damages under 42 U.S.C. § 1983 for subjecting group of patients to involuntary confinement). By contrast, subdivision C addresses the rights of particular individuals, and is significantly more restrictive in that it expressly provides that the individual must be "a resident of the State," and that the subject matter of the representation must have occurred "within 90 days after the date of the discharge of such individual from a [mental heath] facility." 42 U.S.C. § 10805(a)(1)(C); *see, e.g., Goldstein v. Coughlin,* 83 F.R.D. 613, 614 (W.D.N.Y.

1979) (standing accorded to P & A organization to maintain action seeking rehabilitative program to remedy deterioration of inmate).

There are times when a P & A lawsuit encompasses both the rights of a particular individual as well as issues affecting an identifiable group of similarly situated individuals. *See, e.g., Michigan P & A Serv. v. Kirkendall,* 841 F.Supp. 796, 797–98 (E.D.Mich.1993) (PAMII organization suing on behalf of named individual and identifiable group of individuals similarly situated to stop forced sterilizations). In any event, it would be in keeping with the underlying case and controversy requirements of Article III for a PAMII organization to either represent the particular interests of a named individual under subdivision C or address issues directly affecting an identifiable group of individuals under subdivision B. *But see Tennessee P & A, Inc. v. Board of Educ. of Putnam County,* Tn., 24 F.Supp.2d 808, 814–18 (M.D.Tn.1998) (no P & A standing on behalf of any child in an entire county school district who might be disabled).

■ In the present case, PAMII standing does not appear applicable under the restrictive provisions of subdivision C on behalf of Brown or Rothstein since the Clinic has not alleged that their constitutional claims relate to matters which have occurred "within 90 days after" the date of discharge, or even at any time prior to discharge.[5] However, standing appears warranted under subdivision B. As noted in *Trautz,* "if Congress merely intended for state systems to act as advocates on behalf of mentally [ill] individuals, it would not have included (a)(1)(B) in the statute in addition to (a)(1)(C)." *Trautz,* 846 F.Supp. at 1163. Given "the broad remedial purposes of the Act," *Rubenstein,* 790 F.Supp. at 409, the Clinic has identified a particular group of individuals, namely, all those being assessed full charges in response to potentially successful litigation brought against OMH or its employees, and has put forth an arguable basis to support its claim for injunctive relief correlated to "the protection of mentally ill individuals who are receiving care or treatment in the State," § 10805(a)(1)(B), namely, that exposure to monetary damages for tortious conduct or for violation of a patient's constitutional rights will enhance patient care and treatment.

### b. Injury-in-fact

In respect to its claim that it has separate standing on its own behalf because it has suffered an injury-in-fact, the Clinic asserts:

Patients who have been harmed by systemic practices that have resulted from the absence of a threat of civil liability failing to deter unlawful conduct by the OMH and its employees have sought the services of the Clinic.

Pervasive and systemic violations lead to a greater number of lawsuits filed by the Clinic in order to vindicate the rights of patients or former patients of facilities operated by the OMH who have filed suit against the State or its employees.

Plaintiff Clinic has limited funds with which it is able to pursue remedial action on behalf of its clients.

Upon information and belief, increased litigation on behalf of patients or former patients who bring suit necessitates that plaintiff Clinic devote a substantial amount of its limited resources to the prosecution of actions resulting from these systemic violations that would not have occurred if the OMH took corrective measures to eliminate these systemic violations, which diminishes the ability

---

**5.** It is difficult to fathom that Congress intended to limit PAMII suits on behalf of individuals to the narrow window of matters occurring "within" 90 days after discharge. If this language were to be taken at face value, it would preclude PAMII standing for patient abuse and mistreatment during the patient's hospital confinement. In light of the obvious drafting error, the statute should undoubtedly be interpreted as relating to matters "up to" 90 days after discharge.

of the Clinic to provide services to other individuals who require assistance.

Complaint ¶¶ 112–15.

Following on the heels of *Acevedo* and *Siegel,* this lawsuit marks the third litigation effort during the past few years by the Clinic to curtail what it deems to be systemic violations by OMH of the constitutional entitlement of present or former mental patients to have effective access to the courts for redress of their legal rights. These litigations have undoubtedly diverted the Clinic's resources from other aspects of their statutory mission. It is questionable, however, whether the pursuit of litigation alone can constitute an organizational injury sufficient to establish standing under Article III of the Constitution. The Third Circuit has recently held that it cannot, noting that "[a] number of our sister courts have, however, adopted different views of whether the injury necessary to establish standing flows automatically from the expenses associated with litigation." *Fair Housing Council,* 141 F.3d at 78–79. The division amongst the circuits seemingly depends on the particular circuit view of the reach of the Supreme Court's holding in *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), where the Court found that an allegation by an organization in a racial steering case that it had to devote significant resources to identify and counteract the defendant's racially discriminatory practices, was sufficient to support standing because such steering practices "perceptibly impaired [the organization's] ability to provide counseling and referral services for low-and moderate-income homeseekers." *Id.* at 379, 102 S.Ct. 1114. As the Court explained: "Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources— constitutes far more than simply a setback to the organization's abstract social interests." *Id.* (citations omitted).

Those circuits which have taken a narrow reading of *Havens* have invariably held that something more than mere litigation expense must be incurred; "otherwise any litigant could create injury in fact by bringing a case, and Article III would present no real limitation." *Spann v. Colonial Village, Inc.,* 899 F.2d 24, 27 (D.C.Cir.1990) (holding that fair housing organization cannot manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit). Others, such as the Seventh Circuit, have taken a broader view. *See Village of Bellwood v. Dwivedi,* 895 F.2d 1521, 1526–27 (7th Cir.1990) (holding that diversion of resources because of litigation expenses supports standing).

The Second Circuit has seemingly opted for the broader view. *See Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d 898 (2d Cir.1993). Although the claimed injury to the organization in *Ragin* was more pervasive than the expenditure of legal resources to counteract defendant's discriminatory practices, the court nonetheless thought it significant that the deputy director of the organization testified "that the time she and her coworkers spent on matters related to this case prevented them from devoting their time and energies to other [organization] matters." *Id.* at 905. More significantly, the court quoted with approval the explicit holding of the Seventh Circuit in *Village of Bellwood,* that " 'the only injury which need be shown to confer standing on a fair-housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination.' " *Id.* (quoting *Village of Bellwood,* 895 F.2d at 1526).

In the present case, the Clinic does not base its standing solely, as in *Spann,* on the basis of the expenses incurred in the very lawsuit that it has brought. Rather, its claim is that it has repeatedly incurred litigation expenses because of OMH's persistent and pervasive systemic

activities.[6] Presumably, the Second Circuit would find that such expenditures suffice to establish the requisite injury-in-fact to support organizational standing.

### B. Counterclaim Issue

Under OMH's counterclaim policy, it first assesses charges as a predicate to the counterclaim. Notably, OMH does not contend that if it cannot lawfully interpose its counterclaim, it would violate the holding in *Acevedo*, and once again assess charges in response to Court of Claims litigation.

Although the parties ask the Court to pass upon the constitutionality of OMH's counterclaim policy, it is a general practice that federal courts

> will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.... Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.

*Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *see County Court of Ulster County, New York v. Allen*, 442 U.S. 140, 154, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979) (federal courts have a "strong duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties"); *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 582, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979); *Ballard v. Rockville Centre Housing Auth.*, 605 F.2d 1283, 1286 (2d Cir.1979). This principle holds true even if the non-constitutional issue will be decided under state law, *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 294–95, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982), unless

*Pullman* abstention is indicated. *See Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

Accordingly, the Court raised the issue *sua sponte* of whether under State law a counterclaim contingent upon the success of a plaintiff's cause of action is procedurally cognizable. This issue was neither raised by the parties in *Siegel*, nor addressed by the courts in that case. To the contrary, Special Term succinctly identified the constitutional issue as the sole issue, stating: "[Plaintiffs] bring this declaratory action seeking a judgment enjoining and declaring unconstitutional the present OMH practice of asserting counterclaims for hospitalization and treatment charges in actions brought by patients of CMH facilities against the state." *Siegel*, slip op., at 1–2.

■ Under State law, issue preclusion applies only to those matters " 'actually litigated and determined' " in a prior action. *Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 456, 492 N.Y.S.2d 584, 589, 482 N.E.2d 63 (N.Y.1985) (quoting Restatement (Second) of Judgments § 27 (citations omitted)); *see also In re Sokol*, 113 F.3d 303, 306 (2d Cir.1997) (citing *Kaufman*, 65 N.Y.2d at 456, 492 N.Y.S.2d at 589, 482 N.E.2d 63) (in federal forum, application of *res judicata* and collateral estoppel of prior state court proceedings governed by state law). *Siegel* does not, therefore, collaterally estop the Court from addressing the issue of the procedural viability of the counterclaim under State law since *Siegel* decided the constitutional issue on the unchallenged and unexamined assumption that the counterclaim was procedurally viable. Indeed, the parties have agreed that a determination by the Court that OMH could not procedurally assert a counterclaim against the class action plaintiffs in the Court of Claims would obviate

---

**6.** Although the extent of the drain on its resources has not been quantified in the Clinic's submissions, the nature of the *Acevedo* and *Siegel* litigations, as well as the present litiga-

tion, support the factual conclusion that the diversion of plaintiff's resources by reason of these litigations has been substantial. *See Thompson*, 15 F.3d at 249.

the need to pass upon the constitutionality of OMH's counterclaim policy. *See* Tr., February 6, 1998, at 12, 16–17.

■ If the Court were to pass upon the constitutionality of OMH's counterclaim policy, it may well be that it would concur with the State courts in *Siegel*, which had little difficulty in rejecting the plaintiffs' constitutional challenge.[7] Principles of *res judicata* and collateral estoppel would not interfere with such a determination since the parties have stipulated that it is one of the issues which they wish the Court to decide in this litigation. *See* Stipulation ¶ 6; *see also* Tr., January 25, 1999, at 3, 25 (counsel for OMH agreeing that Court should decide the constitutional issue).[8]

■ Notwithstanding the parties' collective desire to revisit *Siegel*, the Court, in deference to its jurisprudential "duty" to dispose of claims on non-constitutional grounds, is of the opinion that, as a matter of State law, OMH cannot assert a counterclaim to recover its costs for services which it had rendered to an indigent mental health patient, in response to being sued by that indigent. The rationale for

this conclusion is bottomed on the contingent nature of the counterclaim and the State law proscription against contingent counterclaims. Since the Court believes that the State law is "clear" in these regards, *Pullman* abstention is not indicated.[9]

## 1. Prohibition Against Contingent Counterclaims Under State Law

■ Under State law, "a counterclaim may be any cause of action in favor of one or more defendants." New York Civil Practice Law and Rules ("CPLR") § 3019(a). The test is "whether the counterclaim is itself sufficient to support an independent cause of action against plaintiff in the same capacity in which plaintiff sues," *Geddes v. Rosen*, 22 A.D.2d 394, 397, 255 N.Y.S.2d 585, 588 (1st Dep't 1965), and it is therefore "judged under the same standard as a complaint." Weinstein, Korn, & Miller, New York Civil Practice ¶ 3019.06 (citing cases at n. 46). Thus, "[a] counterclaim cannot be contingent, it must allege a viable cause of action." *Fehlhaber Corp. v. State*, 69 A.D.2d 362, 374, 419 N.Y.S.2d 773, 779 (3d Dep't 1979); *see*

---

7. The Court notes that, in addition to the unanimous affirmance, without opinion, by the Appellate Division in *Siegel*, the dismissal of the appeal therein to the State Court of Appeals was, as acknowledged by plaintiffs' counsel during oral argument, "for failing to raise a substantial constitutional question." Tr., January 25, 1999, at 15.

8. Since *res judicata* and collateral estoppel "in no way implicate jurisdiction," *Thompson*, 15 F.3d at 253, parties to a litigation may stipulate to their waiver, *see Sinicropi v. Milone*, 915 F.2d 66, 68 (2d Cir.1990) (citations omitted), which stipulation may be judicially enforced provided, as here, the parties have not created a case "by stipulating to facts that do not exist," and it would not be "manifestly unjust to enforce the stipulation." *Id.* (citations omitted).

9. In order to invoke *Pullman* abstention, which is reserved for "very unusual or exceptional circumstances," *Bad Frog Brewery, Inc. v. NYSLA*, 134 F.3d 87, 94 (2d Cir.1998), one of the criteria is that there must be "an unclear state statute or uncertain state law issue." *Planned Parenthood of Dutchess–Ulster,*

*Inc. v. Steinhaus*, 60 F.3d 122, 126 (2d Cir. 1995). The Court has addressed the issue of *Pullman* abstention *sua sponte* because it raises important federalism concerns. *See Catlin v. Ambach*, 820 F.2d 588, 591 (2d Cir.1987) (citing *Bellotti v. Baird*, 432 U.S. 132, 143 n. 10 (1976)). In respect to *Younger* abstention, *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), which defendants have expressly raised, it requires, *inter alia*, that "the plaintiff has an avenue open for review of constitutional claims in the state court," *Hansel v. Town Court*, 56 F.3d 391, 393 (2d Cir.1995). *Younger* abstention cannot be invoked because the Court of Claims does not have jurisdiction to pass upon federal constitutional issues, *see Ozanam Hall of Queens Nursing Home, Inc. v. State*, 241 A.D.2d 670, 671, 661 N.Y.S.2d 54, 55 (3d Dep't 1997), or to grant primarily equitable relief, *see Koerner v. State*, 62 N.Y.2d 442, 449, 478 N.Y.S.2d 584, 587, 467 N.E.2d 232 (1984); *Barrier Motor Fuels, Inc. v. Boardman*, 256 A.D.2d 405, 681 N.Y.S.2d 594, 595 (2d Dep't 1998).

*Kane v. Kane,* 163 A.D.2d 568, 571, 558 N.Y.S.2d 627, 629 (2d Dep't 1990) ("A counterclaim is in essence a complaint against the plaintiff and alleges a present viable cause of action upon which the defendant seeks judgment." (quotation and citation omitted)).

OMH is simply incorrect, therefore, in contending that a counterclaim need not be predicated upon an existing cause of action. *See* Dft.S.J.Mem. at 5–8. Indeed, one of the cases it relies upon, *Atlantic Gulf & West Indies S.S. Lines v. City of New York,* 188 Misc. 279, 67 N.Y.S.2d 753 (N.Y.Sup.Ct., N.Y.County, 1946), *modified,* 271 A.D. 1008, 69 N.Y.S.2d 796 (1st Dep't), *appeal denied,* 272 A.D. 793, 71 N.Y.S.2d 705 (1st Dep't 1947), specifically supports the opposite conclusion. Although Special Term in that case cryptically concluded "that the repeal and reenactment of [s]ection 266, Civil Practice Act, in 1936 removed the requirement that the counterclaim be a cause of action in existence at the time it is interposed," 188 Misc. at 280, 67 N.Y.S.2d at 754, relying upon the contingent nature of third-party actions and cross-claims for indemnification and contribution under sections 193 and 264 of the Civil Practice Act, the modification by the Appellate Division expressly dismissed the counterclaim "inasmuch as it fail[ed] to allege a presently existing cause of action," and "[s]ection 266 of the Civil Practice Act d[id] not alter this requirement." 271 A.D. at 1008, 69 N.Y.S.2d at 796 (citations omitted).[10]

The Court of Appeals in *James Talcott, Inc. v. Winco Sales Corp.,* 14 N.Y.2d 227, 250 N.Y.S.2d 416, 199 N.E.2d 499 (1964), also inappropriately relied upon by OMH, explained that the 1936 counterclaim amendments to the Civil Practice Act, which have been carried over into the CPLR, broadened the reach of counterclaims when it defined a counterclaim as "any cause of action in favor of the defendant against the plaintiff," *id.,* 14 N.Y.2d at 232, 250 N.Y.S.2d at 419, 199 N.E.2d 499, whereas previously counterclaims were limited to recoupment ("a claim arising out of the same contract or transaction sued on in the complaint") and setoff ("a claim arising out of contract independent of the contract bottoming the complaint"). *Id.,* 14 N.Y.2d at 231, 250 N.Y.S.2d at 417, 199 N.E.2d 499 (citations omitted). However, prior to the amendments, a counterclaim in the nature of recoupment "was assertable in an action by an assignee even though said claim matured after the time of the assignments or after notice of the assignment," while a counterclaim in the nature of a setoff was not. *Id.,* 14 N.Y.2d at 231–32, 250 N.Y.S.2d at 419, 199 N.E.2d 499. The Court simply held in *Talcott* that the amendments did not affect this statutory distinction. There is nothing in *Talcott* that even remotely suggests that the 1936 amendments gave birth to contingent counterclaims.

The remaining cases cited by OMH to support its contention that State law sanctions contingent counterclaims are also of no avail. *See Delta Franchising, Inc. v. PCP Transmissions, Inc.,* 107 A.D.2d 734, 734, 484 N.Y.S.2d 94, 95 (2d Dep't 1985) (permitting counterclaims derived from existing rights which plaintiffs also claimed); *Rye Psychiatric Hospital Center v. Persky,* 54 A.D.2d 711, 711, 387 N.Y.S.2d 456, 456 (2d Dep't 1976) (permitting counterclaim for an *existing* cause of action by defendant to recover monies paid to plaintiff); *Paterno & Sons, Inc. v. Town of New Windsor,* 43 A.D.2d 863, 863–64, 351 N.Y.S.2d 445, 447–48 (2d Dep't 1974) (permitting liquidated damages counterclaim

---

10. In so ruling, the Appellate Division implicitly rejected Special Term's reliance on third-party actions and cross-claims for indemnification and contribution. The Legislature has determined that judicial economy is best served by resolving in one lawsuit issues impacting the apportionment of liability amongst those who may be liable for all or part of a plaintiff's claim, and has, accordingly, made statutory provision for this limited type of contingent litigation. *See* CPLR 3019(b) (cross-claims); CPLR 1007, 1008 (third-party actions). It has not done so in respect to counterclaims.

for delay in performance by plaintiff prior to breach of parties' contract based upon underlying facts in existence at time of counterclaim).

■ OMH does cite to one Special Term case that holds that a counterclaim for malicious prosecution contingent on the termination of the plaintiff's action in defendant's favor may be asserted in that lawsuit. *See Herendeen v. Ley Realty Co.,* 75 N.Y.S.2d 836, 837 (N.Y.Sup.Ct., N.Y.County, 1947). This is clearly a wrongly decided case since, consistent with the principle that contingent counterclaims are impermissible, the appellate courts have time after time expressly held that a counterclaim for malicious prosecution or abuse of process will not lie in the civil action that was allegedly wrongfully instituted for the very reason that it would be contingent upon the termination of that action in defendant's favor. *See Sasso v. Corniola,* 154 A.D.2d 362, 362, 545 N.Y.S.2d 839, 840 (2d Dep't 1989); *Flaks, Zaslow & Co., Inc. v. Bank Computer Network Corp.,* 66 A.D.2d 363, 366, 413 N.Y.S.2d 1, 3 (1st Dep't 1979); *Ellman v. McCarty,* 70 A.D.2d 150, 156, 420 N.Y.S.2d 237, 241 (2d Dep't 1979); *Bronstein v. Dayton Peninsula Corp.,* 11 A.D.2d 1036, 1036, 206 N.Y.S.2d 12, 14 (2d Dep't 1960). Thus, in accordance with the rule proscribing contingent counterclaims, it is impermissible to assert a counterclaim that is dependent on the outcome of a plaintiff's lawsuit. *See Sperry v. Saul,* 14 Misc.2d 161, 168, 178 N.Y.S.2d 421, 428 (N.Y.Sup. Ct., Kings County, 1958) (dismissing counterclaims which were "contingent [on] the success of the plaintiff in his lawsuit") (citing *Atlantic Gulf & West Indies S.S. Lines v. City of New York,* 271 A.D. 1008, 69 N.Y.S.2d 796); *see also Efdey Electrical Contractors, Inc. v. Melita,* 167 A.D.2d 501, 502, 562 N.Y.S.2d 172, 173 (2d Dep't 1990) (dismissing contingent counterclaim); *Fehlhaber Corp.,* 69 A.D.2d at 374, 419 N.Y.S.2d at 779 (same).

## 2. Contingent Nature of Counterclaim

■ The Mental Hygiene Law facially invests OMH with broad discretion in the administration of the recovery of the costs of services and treatment rendered to the mentally ill, *see* Mental Hyg. L. § 43.01 *et seq.*, and provides that "[t]he commissioner may reduce or waive fees in case of inability to pay or other reasons," Mental Hyg. L. § 43.03(b). However, consistent with the statutory mandate that "no person shall be denied services because of inability or failure to pay a fee," Mental Hyg. L. § 43.01(a), the standards for fixing and collecting fees "are and have always been cost and ability to pay." *State v. Dolan,* 89 Misc.2d 1003, 1005, 392 N.Y.S.2d 980, 983 (Civil Ct., N.Y.County, 1977); *see In re Kesselbrenner,* 33 N.Y.2d 161, 166, 350 N.Y.S.2d 889, 893, 305 N.E.2d 903 (1973) ("State hospitals, under the jurisdiction of the Department of Mental Hygiene, are required to furnish [ ] services at a cost determined by ability to pay." (internal citations omitted)). It plausibly follows that OMH cannot initiate litigation against a recipient of mental health treatment and services, or one statutorily responsible for the payment of charges, if that person is indigent. Indeed, sections 43.03 and 43.07 of the Mental Hygiene Law, which have been construed as "recovery" statutes, *In re Will of Seelen,* 87 Misc.2d 360, 365, 386 N.Y.S.2d 302, 306 (N.Y.Surrogate's Ct., Kings County, 1976), contemplate that a cause of action accrues only when the recipient or his responsible relative, or either's estate, has the financial wherewithal to pay. As explained by Surrogate Sobel in *Seelen:*

> A 'recovery' statute authorizes a Department to recover from a recipient or patient or responsible relative who may not have been of 'sufficient ability' at the time care or assistance was furnished but who later came into possession of property. As discussed in [*Matter of Colon,* 83 Misc.2d 344, 349–50, 372 N.Y.S.2d 812, 820–22 (N.Y.Surrogate's Ct., Kings County, 1975) ], recovery

statutes are purposed to recover from either (a) 'windfalls' (generally personal injury recoveries or inheritances) of either the recipient himself or his responsible relatives or (b) from the Estates of deceased recipients or responsible relatives. Such 'recovery' statutes authorize the Commissioner to commence an action against a recipient, his estate, a responsible relative or the estate of a responsible relative 'discovered to have real or personal property.'

*In re Will of Seelen*, 87 Misc.2d at 362–63, 386 N.Y.S.2d at 304.

The need to establish the "ability to pay" is rightfully viewed, therefore, as "a condition precedent to liability," *In re Mangan's Will*, 83 N.Y.S.2d 393, 399 (N.Y.Surrogate's Ct., Broome County, 1948), and accordingly is "an element that the State is required to establish to sustain its burden of proof." *State v. Ross*, 109 A.D.2d 937, 938, 486 N.Y.S.2d 414, 415 (3d Dep't 1985). Plainly, therefore, the State has no current cause of action against any plaintiff in the present case. Indeed, Mental Hygiene Law § 43.07(c) expressly provides that a cause of action for the collection of fees only accrues "when the fees become due."

OMH attempts to justify its contingent counterclaim on the notion that it has the right to "target" those who might possibly soon acquire the financial wherewithal to justify a change in their indigent status. *See* Dft. S.J. Mem. at 10. It contends in that regard that "[n]umerous cases have upheld the authority of OMH to make such adjustments, without regard to the circumstances which give[ ] rise to the patient's ability to pay." *Id.* None of the cases cited by OMH supports this "targeting" thesis. To the contrary, they invariably simply identify either the particular source of *existing* funds that can be reached, or the person or entity responsible for payment. *See State v. Coyle*, 171 A.D.2d 288, 289–90, 575 N.Y.S.2d 975, 976 (3d Dep't 1991),

*appeal dismissed,* 79 N.Y.2d 805, 580 N.Y.S.2d 188, 588 N.E.2d 86 (1991) (corpus of trust created to benefit former OMH patient was available to pay for services rendered to patient before and after trust creation); *In re Estate of Osadchey,* 53 A.D.2d 960, 961, 385 N.Y.S.2d 838, 839 (3d Dep't 1976) (OMH entitled to payment from estate of former patient who had inherited monies during her hospitalization); *In re Will of Seelen,* 87 Misc.2d at 365–66, 386 N.Y.S.2d at 306 (OMH entitled to funds of committee established to manage assets of an OMH patient); *In re Mangan's Will,* 83 N.Y.S.2d at 410 (State had valid claim against estate of parent of adult child who had been in State hospital during parent's lifetime); *In re Estate of Gnerre,* 87 Misc.2d 700, 703, 386 N.Y.S.2d 763, 765 (N.Y. Surrogate's Court, Albany County, 1976) (OMH entitled to reach proceeds of estate of deceased patient).

Two other cases cited by OMH address other unrelated issues. In *Rosado v. Rosado,* 123 A.D.2d 292, 293–94, 506 N.Y.S.2d 444, 445 (1st Dep't 1986), the appellate court simply exercised its discretion in approving an infant's compromise for a retarded infant who had been injured in a car accident, since it did not appear that the infant would benefit from a trial 13 years after the accident and nine years after a multi-party settlement for a host of reasons, including the court's belief that the state would have a prior lien for services rendered to the infant under the Mental Hygiene Law. In *Carlon v. Regan,* 98 A.D.2d 544, 471 N.Y.S.2d 896 (3d Dep't), *aff'g on modified opinion,* 63 N.Y.2d 1011, 484 N.Y.S.2d 506, 473 N.E.2d 734 (1984), the Court of Appeals gave its approbation to the right of the State's Comptroller to use a setoff against tort awards by mental health patients as a mechanism for collecting fees for services rendered at the State's mental health facilities.[11]

---

**11.** This holding in *Carlon* was recognized by the court in *Acevedo,* 778 F.Supp. at 189.

Although not expressly so stating, that part of *Acevedo* which holds that the State's set-off

In sum, OMH offers no statutory or case authority to countermand the ineluctable conclusion that since a counterclaim by OMH to recover its costs for treatment and services rendered to an indigent plaintiff would clearly be contingent upon the success of the plaintiff's litigation, it could not support "an independent cause of action against plaintiff in the same capacity in which plaintiff sues," *Geddes*, 22 A.D.2d at 397, 255 N.Y.S.2d at 588, and therefore cannot be a valid counterclaim under State law.

There is an obvious sound policy reason for precluding contingent counterclaims— the avoidance of unnecessary litigation. For example, in the present case, since the contingent counterclaim would be dependent on the outcome of Brown and Rothstein's cases, if the plaintiffs were to lose, the counterclaim portions of the trials and all of the pre-trial preparation attendant upon the appropriateness of OMH's charges would have been in vain, because their indigent status and ability to pay would not have been altered.

OMH's apparent primary concern is that its ability to recover would be compromised because the statute of limitations would be running during the pendency of a plaintiff's lawsuit. *See* Dft.S.J.Mem. at 8– 9.[12] Its concern appears misplaced because the six-year period of limitations under Mental Hygiene Law § 43.07(c) does not run until the fees become due. Since in the case of an indigent, this condition precedent to liability equates to the ability to pay, the statute of limitations may well be viewed to run from such time because "when the condition precedent creates the right to payment, and without

its satisfaction no right to payment exists, then the condition precedent necessarily determines when the cause of action accrues and, *ipso facto*, when the Statute of Limitations begins to run." *Continental Ins. Co. v. Richt*, 253 A.D.2d 818, 820, 677 N.Y.S.2d 634, 635 (2d Dep't 1998) (citations omitted). The Court will not, however, pass upon this statute of limitations issue since it is not essential to this litigation. Moreover, since the question involves one of state law, it will most likely surface in a state court proceeding, which is the preferred forum for its resolution. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."); *Condor Corp. v. St. Paul*, 912 F.2d 215, 220 (8th Cir.1990) ("We also recognize within principles of federalism the necessity to provide great deference and comity to state court forums to decide issues involving state law questions.").[13] Regardless of how the statute of limitations issue be resolved, it cannot transform a contingent claim into an actual one.

OMH also expresses an unfounded fear that "plaintiffs could insulate themselves from paying hospitalization and treatment costs simply by filing a lawsuit against the OMH," which would thereby "force OMH to capitulate even in those circumstances where patient-litigants subsequently accrue income through sources that have no connection to pending lawsuits against it." Dft.S.J.Mem. at 11. If an indigent plaintiff acquires the ability to pay after the

---

procedure failed to comport with due process requirements because it did not provide an "adequate predeprivation hearing", *id.*, appears to implicitly undermine *Carlon*.

12. OMH recognizes that this concern has no cogency when indigent plaintiffs sue OMH's employees outside of the Court of Claims, such as Brown and Rothstein's suits in the State Supreme Court, because OMH is not a party to such litigation.

13. The Court notes that neither of the two cases OMH cites in support of its statute of limitations concern addresses the question of whether the statute runs during indigency. *See In re Piper*, 145 A.D.2d 97, 537 N.Y.S.2d 923 (3d Dep't 1989); *Connor v. State*, 196 Misc. 846, 93 N.Y.S.2d 391 (N.Y.Ct. of Claims 1949). Nor has the Court found any State case dealing with the issue.

commencement of litigation, regardless of the source, thereby giving rise to a viable fee collection cause of action, OMH could simply seek leave to supplement its answer, pursuant to CPLR 3025(c), to assert the subsequently acquired cause of action as a legitimate counterclaim. Pointedly, the *sine qua non* for the counterclaim would be the subsequent accrual of an actual—not a contingent—cause of action.

## C. Constitutional Issues

In the absence of the issue of the constitutionality of the State's counterclaim policy, which is the focus of plaintiffs' First and Second Causes of Action, the remaining constitutional issues arise in the context of defendants' FRCP 12(b)(6) motion to dismiss Brown and Rothstein's Equal Protection and First Amendment claims (Third and Fourth Causes of Action), and their § 1983 and PAMII preemption claims. (Fifth and Sixth Causes of Action).

## 1. First Amendment

Brown and Rothstein allege that OMH has assessed full charges in response to lawsuits brought by them in the State Supreme Court against OMH employees, and that this chills their First Amendment right to access to the courts. Although the precise issue of whether full charges can be assessed against an indigent in response to suits against OMH employees in the State Supreme Court was not before the court in *Acevedo*, which dealt specifically with litigation brought against the State in the Court of Claims, there is no principled distinction between these two scenarios in regard to applicable First Amendment concerns, which the Court believes were properly identified and resolved in *Acevedo*.

*Acevedo* correctly recognized that all persons enjoy a constitutional right of access to the courts. *See Acevedo*, 778 F.Supp. at 184 (collecting cases). Although the court was of the opinion that this right of access "is guaranteed by the First Amendment right to petition the government for the redress of grievances," *id.*, it is uncertain whether this is the exclusive basis for the right. *See Monsky v. Moraghan*, 127 F.3d 243, 246 (2d Cir.1997) ("the source of this right has been variously located in the First Amendment right to petition for redress, the Privileges and Immunities Clause of Article IV, section 2, and the Due Process Clauses of the Fifth and Fourteenth Amendments"). While the origins of the right, as well as its contours, may be the subject of debate, *see* Kara E. Shea, Note, San Filippo v. Bongiovanni: *The Public Concern Criteria and the Scope of the Modern Petition Right*, 48 Vand.L.Rev. 1697, 1700–04 (1995), the right of access to the courts nonetheless remains a fundamental conscript of constitutional law. To the extent that it is bound up in the right to petition for the redress of grievances, which is "among the most precious of liberties safeguarded by the Bill of Rights," *United Mine Workers of Am. v. Illinois Bar Ass'n*, 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967), the right of court access is "intimately connected both in origin and in purpose with the other First Amendment rights of free speech and free press." *Id.* However, its historical reach is such that it has poignantly been argued that it is even more firmly rooted than the freedoms of speech and press. *See* 48 Vand.L.Rev. at 1700 ("There is no doubt that the recognition of the petition right in Anglo–American jurisprudence substantially predates the recognition of the other enumerated first amendment rights.").

Clearly then, the court in *Acevedo* correctly relied upon the law prohibiting retaliation for the exercise of free speech promulgated by the Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), in asserting that the constitutional right of access cannot be chilled by actions motivated by or substantially caused by a plaintiff's decision to exercise the right. *See Acevedo*,

778 F.Supp. at 183–84. This proscription against retaliation for exercising rights bound up in the First Amendment has consistently been applied by the Second Circuit. *See, e.g., Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir.1998); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 120 (2d Cir.1995).

There are a number of Second Circuit cases subsequent to *Acevedo* that aid in the evaluation of whether particular conduct can rightfully be viewed as chilling the exercise of one's constitutional rights. In *Spear v. Town of West Hartford*, 954 F.2d 63 (2d Cir.1992), the court, drawing upon the Supreme Court's holding in *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), that the chilling effect cannot be "remote" and "speculative," dismissed a complaint that "offered nothing more than bare assertion" that a lawsuit that was filed against the plaintiff caused a chilling effect upon his First Amendment free press and speech rights. *Spear*, 954 F.2d at 67; *see Hankard v. Town of Avon*, 126 F.3d 418, 424 (2d Cir. 1997) ("The chilling effect alleged by the plaintiff is speculative, indirect and remote, and there is no evidence in the record that plaintiffs did in fact suffer a cognizable constitutional deprivation."). In *Levin v. Harleston*, 966 F.2d 85 (2d Cir.1992), the court, while acknowledging *Laird's* rejection of allegations of a subjective chill as an adequate substitute for a claim of "specific present objective harm or threat of specific future harm," *id.* (quoting *Laird*, 408 U.S. at 13–14, 92 S.Ct. 2318 (quotation omitted)), recognized, however, that "it is plain that an implicit threat can chill as forcibly as an explicit threat." *Levin*, 966 F.2d at 90.

In *Greenwich Citizens Committee, Inc. v. Counties of Warren and Washington Industrial Development Agency*, 77 F.3d 26, 27–28 (2d Cir.1996), the court addressed the issue of "whether a governmental defendant in an underlying state court lawsuit must be shown to have acted with retaliatory intent in filing counter-claims before it may be held liable for chilling the First Amendment rights of the plaintiffs who brought the lawsuit." Factually, plaintiffs had filed a state lawsuit questioning whether the defendant municipalities had held adequate public hearings, conducted proper environmental impact studies, and complied with applicable environmental guidelines, before approving the financing and construction of a certain municipal project. They were met, in turn, with counterclaims because the lawsuit delayed the implementation of the project and resulted in higher costs. The complaint and counterclaims were ultimately dismissed, but plaintiffs nonetheless sought damages against the municipalities in a subsequent federal lawsuit predicated upon the claim that the counterclaims were brought in retaliation for the exercise by plaintiffs of their First Amendment rights. In reversing a jury verdict for plaintiffs, the Second Circuit held that it was not sufficient to merely charge the jury that it had to determine whether the counterclaims had any chilling effect upon the plaintiffs; the jury had to also separately determine whether defendants acted with retaliatory intent. As the court stated:

> In this case, we hold that, even though the Greenwich plaintiffs have shown cause and effect, in the strict sense that IDA and Warren County would not have filed their state court counterclaims "but for" the Greenwich plaintiffs' filing of their state court lawsuit, the Greenwich plaintiffs are nevertheless required to persuade the jury that the counterclaims were filed, not as a legitimate response to litigation, but as a form of retaliation, with the purpose of deterring the exercise of First Amendment freedoms.

*Id.* at 31.

Finally, in *Monsky*, the Second Circuit, lifting language from the Supreme Court's decision in *Lewis v. Casey*, 518 U.S. 343, 349, 116 S.Ct. 2174, 2179, 135 L.Ed.2d 606 (1996), that in order to establish a violation of access to courts, a plaintiff must demonstrate that a defendant " 'hindered [a

plaintiff's] efforts to pursue a legal claim,'" *Monsky,* 127 F.3d at 247 (quoting *Lewis,* 116 S.Ct. at 2180 (quotation omitted)), a concept of "actual injury" that "derives ultimately from the doctrine of standing," *id.* (quoting *Lewis,* 116 S.Ct. at 2179 (quotation omitted)), dismissed plaintiff's claim that her right of access to courts was compromised when the defendant permitted his dog to harass her in the court clerk's office while she was examining court files. The court's rationale was bottomed on plaintiff's acknowledgment "that the alleged episodes had not caused prejudice to her litigation interests," and that while she may have suffered emotional distress and humiliation, this was not the "type of actual injury that gives rise to a constitutional claim of denial of access to the courts." *Id.* at 247.

■■ Unlike *Monsky,* the nature of Brown and Rothstein's claimed injuries in the present case satisfies the requisite constitutional harm since they each allegedly considered withdrawing their lawsuits. Rothstein, in particular, has specifically been threatened with litigation for the full assessment of charges ascribed to him if he fails to pay such charges. It would be implausible for plaintiffs to actually withdraw their lawsuits as the price to pay for acquiring constitutional standing to challenge the threats which the State has visited upon them in response to the initiation of the lawsuits. Moreover, it cannot factually be determined, in the context of a FRCP 12(b)(6) motion to dismiss for failure to state a claim, whether the threats may have had some impact on the effective prosecution of the lawsuits. Indeed, in *Greenwich,* the Second Circuit specifically embraced the holding by the Eighth Circuit in *Harrison v. Springdale Water & Sewer Commission,* 780 F.2d 1422, 1428 (8th Cir.1986), that "a tactical move to put pressure on [plaintiff] to settle"—in that case the filing of an allegedly frivolous counterclaim—sufficed to support a cognizable retaliation claim. *See Greenwich,* 77

F.3d at 31. As the *Harrison* court further explained:

> An individual's constitutional right of access to the courts cannot be impaired, either directly ... or indirectly, by threatening or harassing an [individual] in retaliation for filing lawsuits. It is not necessary that the [individual] succumb entirely or even partially to the threat as long as the threat or retaliatory act was intended to limit the [individual's] right of access. The cases from this Circuit, as well as from others, make it clear that state officials may not take retaliatory action against an individual designed either to punish him for having exercised his constitutional right to seek judicial relief or to intimidate or chill his exercise of that right in the future.

780 F.2d at 1427–28 (internal quotation and citation omitted; textual omission in original); *see also Acevedo,* 778 F.Supp. at 184 (the fact co-defendant Nunnery "considered withdrawing" her lawsuit was sufficient to establish that OMH's action had a chilling effect since it was not necessary that she "'succumb entirely or even partially to OMH's threat'" (quoting *Harrison,* 780 F.2d at 1427–28)).

In sum, defendants' FRCP 12(b)(6) motion to dismiss Brown and Rothstein's First Amendment claims must be denied because these plaintiffs have sufficiently alleged that (1) "[they have] an interest protected by the First Amendment"; (2) "the defendant[s]' actions were motivated by or caused by the plaintiff[s]' exercise of that right"; and (3) "the defendant[s]' action[s] effectively chilled the exercise of plaintiff[s]' First Amendment rights." *Connell,* 153 F.3d at 79. In this latter regard, a factfinder, in assessing whether the defendants' conduct had the requisite chilling effect, would be free to consider the full spectrum of relevant factual matters, including plaintiffs' decisions to continue their lawsuits, and the proportionality that plaintiffs' charges bear to the value of the lawsuits. For example, if Roth-

stein's lawsuit were perceived to be worth significantly more than his $24,760.14 bill, the chilling effect could be found to be wanting.[14]

Based upon colloquy during oral argument, the parties apparently would like the Court to advise them as to whether it would be constitutionally permissible for OMH to notify an indigent who has sued OMH or any of its employees, that charges will be assessed up to the amount of any recovery which might be realized by the plaintiff's lawsuit. *See, e.g.,* Tr., January 25, 1999, at 38 (assertion by defendants' counsel that OMH should be allowed to notify plaintiffs that charges have been assessed against them "[a]s long as the charges that OMH is seeking to assess is less than the amount of relief that plaintiff is seeking"). This also appears to be the thrust of that part of the parties' Stipulation requesting the court to determine whether it is constitutionally permissible for OMH to assess charges in response to lawsuits filed by Rothstein and Brown against OMH employees "up to the full amount of damages" recovered. *See* Stipulation ¶ 7. This issue is not presented, however, by any claim contained in the complaint, although it is understandable that the parties would want to ascertain the type of notice, if any, OMH may effectuate in response to an indigent's lawsuit.

If it were properly presented, the specific language of the notice would have to be scrutinized. For example, the Court would not be inclined to find the requisite chill should the notice clearly and explicitly inform the plaintiff of the applicable law—namely, that under the Mental Hygiene Law, the plaintiff is not liable for the costs of treatment and services provided by OMH unless he or she has the ability to pay; and that if he or she, subsequent to discharge, acquires the ability to pay from any source, including any recovery from

any litigation, a bill for payment will then be presented which, pursuant to Mental Hygiene Law § 43.07(b), must be paid within sixty days in order to avoid the commencement of collection proceedings. Presumably, patients are advised of their legal responsibilities for payment of the costs of services and treatment at the inception of their hospital confinement. Nonetheless, it cannot be concluded that the State has no legitimate reason for advising, or re-advising, an indigent of his or her financial obligations whenever it has reason to believe that a potential change in the indigent's financial circumstances may be imminent. It would be plausible for the State to assert its interest in incipient monies, less they be squandered when realized.

From the plaintiff's perspective, the chilling effect of being so notified of her or his legal obligations is somewhat speculative since the plaintiff has absolutely nothing to lose by pursuing the litigation, and everything to gain should the judgment exceed OMH's bill. Moreover, even if the judgment did not exceed the bill, the plaintiff could benefit from full or partial satisfaction of the bill if subsequent monies were thereafter realized in such amount, which otherwise, barring statute of limitations concerns, would be reachable by OMH. In any event, any perceived chilling effect would appear to be *de minimus,* and hence not of constitutional significance. *See Ingraham v. Wright,* 430 U.S. 651, 674, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) ("There is, of course, a *de minimus* level of imposition with which the Constitution is not concerned."); *Arce v. Banks,* 913 F.Supp. 307, 309 (S.D.N.Y.1996) ("At most, [plaintiff] has suffered a *de minimus* infringement of his First Amendment rights which is not actionable in a § 1983 petition.").

14. Notably, the court in *Acevedo* decided the case on the basis of summary judgment, finding that the undisputed facts, including the fact that the charges *exceeded* the value of

plaintiffs' lawsuits, supported the conclusion that the requisite chill was established as a matter of law. *Acevedo,* 778 F.Supp. at 185.

### 2. Equal Protection

In respect to Brown and Rothstein's Equal Protection claims, implicit in their allegations is that other patients or ex-patients who have pursued a course of action which might provide them with assets to pay for their mental health treatment, are treated differently. *See Acevedo*, 778 F.Supp. at 185–86. "[I]n light of the policy to liberally construe civil rights complaints," *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7 F.3d 1085, 1087 (2d Cir.1993) (citation omitted), dismissal of these claims under FRCP 12(b)(6) is consequently not warranted.

### 3. Preemption

The Court's analysis of the First Amendment and Equal Protection issues presupposes that any monies which might be realized by Brown or Rothstein against OMH or its employees in their State court litigations would not be immune from collection by OMH. Plaintiffs contend, however, that 42 U.S.C. § 1983 "preempts application of Mental Hygiene Law § 43.01 *et seq.* when the assessment of care and treatment charges results in the collection of any award obtained by a patient or former patient arising out of tortious conduct by OMH employees that constitutes a violation of such individuals' rights under the United States Constitution or federal statute." Complaint, Fifth Cause of Action, ¶ 130. They further contend that PAMII, 42 U.S.C. § 10801 *et seq.*, also preempts such awards against OMH employees, and OMH as well. *See* Complaint, Sixth Cause of Action, ¶ 132.

In respect to the § 1983 preemption claim, plaintiffs argue that if OMH would be permitted to implement the collection provisions of the Mental Hygiene Law to reach monies recovered in § 1983 litigations against OMH employees, such as Rothstein's suit in the Supreme Court against Glover and Tinker, it would thwart the deterrent effect of this statute because OMH would have less of an incentive to safeguard the civil rights of its patients.

*See* Plaintiffs' Memorandum of Law in Opposition to Motion To Dismiss ("Pl.Mem."), at 7–11. In respect to the more encompassing PAMII preemption claim, plaintiffs maintain that PAMII's broad objectives, "to protect and advocate the rights of mentally ill individuals and establish a system that ensures the enforcement of such rights," warrant insulating tort awards against OMH and its employees from collection by OMH. *Id.* at 12. This would embrace Brown's suit against OMH in the Court of Claims, in addition to Brown and Rothstein's suits against OMH's employees in the Supreme Court. Although neither of these preemption issues are directly presented by Brown or Rothstein in this litigation since it is not at all certain that either of them will be successful in their State lawsuits, they are nonetheless of sufficient immediacy and reality, especially when coupled with the broad reach of the Clinic's standing, to warrant declaratory intervention. *See In re Prudential Lines Inc.*, 158 F.3d 65, 70 (2d Cir.1998) ("A declaratory judgment action presents an actual controversy if 'the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941))). Furthermore, since the preemption claims raise purely legal issues, declaratory judgment is now warranted.

Plaintiffs base their arguments on the Supremacy Clause, under which "Congress may enact laws that preempt state or local law." *Bedford Affiliates v. Sills*, 156 F.3d 416, 426 (2d Cir.1998). In particular, they rely on the conflict principle of preemption, which provides that "state law may be preempted to the extent that it actually conflicts with a valid federal statute." *Id.* (quotation and internal citation omitted). This "occurs either when compliance with both federal and state regula-

tions is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal citations and quotations omitted). "Of course, 'courts should not lightly infer' that state or local law has been preempted by federal law." *Id.* (quoting *International Paper Co. v. Ouellette*, 479 U.S. 481, 490, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987)).

Plaintiffs find support for their § 1983 preemption claim from a decision of the Eighth Circuit, *Hankins v. Finnel*, 964 F.2d 853 (8th Cir.1992). In that case, the plaintiff had recovered a monetary judgment while a Missouri penitentiary inmate against a prison employee for sexual harassment and molestation. The judgment was paid by the state, on behalf of the employee, under a state indemnification statute. The state attached these funds to defray the costs of incarceration under the Missouri Incarceration Reimbursement Act. In a split decision, the majority of the court preliminarily determined that the state's indemnification statute constituted an implied limited waiver of the state's Eleventh Amendment immunity and, therefore, the state could be subject to suit to determine the lawfulness of its entitlement to the funds it had attached. On the merits, noting the two-fold purpose of section 1983, "to compensate victims and to deter future deprivations of federal constitutional rights," *id.* at 861 (citing *Owen v. City of Independence*, 445 U.S. 622, 651, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980)) (other citations omitted), the court reasoned that "[t]o allow the State to largely recoup this award would be inimical to the goals of [§ 1983]." *Id.* It held, therefore, that "[t]o the extent that the Act permitt[ed] the State to recoup the very monies it ha[d] paid to satisfy a section 1983 judgment against one of its employees," it violated the Supremacy Clause. *Id.*

In dissent, Judge Beam disagreed with each aspect of the majority's decision. In respect to the Eleventh Amendment, he believed that the state's indemnification statute did not effect a waiver since the majority improperly conflated the individual employee and the state, thereby "blurr[ing] the line drawn by the Supreme Court which separates a state from its employees in [§ 1983] litigation." *Id.* at 863. On the merits, Judge Beam railed against the unprecedented nature of the court's decision, which he believed advanced "dubious policy justifications" in "elevat[ing] the 42 U.S.C. § 1983 judgment ... to a status that it does not merit." *Id.* at 861–62. Furthermore, he noted that "the majority's holding fails to provide a workable framework for future adjudication." *Id.* at 865 n. 4. As he explained:

> For example, it is far from clear whether the majority's holding would preclude a state from seeking reimbursement for prison expenses from the proceeds of a prisoner's section 1983 suit unrelated to the conditions of his imprisonment. Presumably such reimbursement would undermine the purposes of section 1983 as directly as the claim for reimbursement in the present case supposedly does. As this example demonstrates, any attempt to restrict the scope of the majority's holding would simply reveal the holding's inherently arbitrary nature.

*Id.* In a footnote response to Judge Beam's polemic, the majority took pains to limit the reach of its decision, commenting that it was based "on the narrow and unique factual situation presented in this case, which in itself is without precedent." *Id.* at 858 n. 6.

The breadth of the majority's decision in *Hankins* was curtailed by that court's subsequent decision in *Beeks v. Hundley*, 34 F.3d 658 (8th Cir.1994), which refused to apply § 1983 preemption to preclude the seizure of inmates' § 1983 damage recoveries to pay victim restitution under Iowa's restitution statute. Although the court recognized the twin purposes of § 1983, it noted that the Supreme Court had observed that " 'compensatory relief to those

deprived of their federal right by state actors'" was its "'central purpose.'" *Id.* at 661 (quoting *Felder v. Casey,* 487 U.S. 131, 141, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988)). In concluding that this "dominant purpose" was not compromised, the court reasoned:

> [U]nder the Iowa statute, the diverted payments satisfy a portion of the inmates' restitution orders—debts that constitute a judgment and lien against all their property and, significantly, are enforceable after their prison sentences have been served. Thus, from a financial standpoint, the inmates received virtually all the benefit of their § 1983 money judgment when the proceeds were applied to satisfy their restitution debts.

*Id.* at 661.

■ In the present case, the monies which may be realized by plaintiffs in their § 1983 litigations should rightfully be available to satisfy the costs of the mental health services and treatment provided by the State. As intimated by *Beeks,* the Court's decision in *Hankins* is limited to the unique circumstances attendant upon reimbursement for costs imposed by the state as a consequence of incarceration.

In respect to the issue of deterrence, which was not implicated in *Beeks,* the State has charged the Commissioner of OMH with the duty to ensure that OMH patients receive proper care and treatment, *see* Mental Hyg. L. §§ 5.05, 7.15, and has enacted a spate of statutory and regulatory provisions designed to guard against patient abuse in the State's mental hospitals. As Special Term pointed out in Siegel, slip op. at 15–16, they include various reporting and monitoring requirements, *see* N.Y. Mental Hyg. L. §§ 7.21(b), 29.29; 14 NYCRR Part 524, and an independent agency charged with investigating incidents of patient abuse and neglect, *see* Mental Hyg. L. § 45.07. Moreover, employees who commit intentional torts, and are thereby subject to punitive damages, cannot seek indemnification from the State. *See* N.Y.Pub.Off.L. §§ 17(3)(a),(c); 18(4)(b)(c); *Sharapata v. Town of Islip,* 56 N.Y.2d 332, 338, 452 N.Y.S.2d 347, 350, 437 N.E.2d 1104 (1982). They may also be subject to criminal prosecution for patient abuse. *See People v. Simon,* 157 A.D.2d 508, 549 N.Y.S.2d 701 (1st Dep't 1990) (upholding verdict for manslaughter in second degree and criminally negligent homicide for acts leading to death of mental hospital patient). And, indeed, PAMII organizations stand ever-ready to search out patient abuse, as evidenced by the admirable past achievements of the Clinic. As Special Term aptly concluded in *Siegel,* "it is doubtful that the threat of increased State liability would make it easier to detect or deter those apathetic or malicious employees who allow to be performed or themselves perform atrocities on the mentally ill." *Siegel,* slip op., at 16.

Finally, the logical conceptual reach of plaintiffs' § 1983 preemption claim would immunize all civil rights recoveries in any § 1983 litigation by one indebted to the State since the issue of deterrence would always be implicated. *See Hankins,* 964 F.2d 865 n. 4 (dissenting opinion) There is simply no warrant for such an amorphous and arbitrary application of the preemption doctrine. Moreover, since the State cannot be sued under § 1983 because it is not a "person" under the statute, *see Will v. Michigan Dep't of State Police,* 491 U.S. 58, 61, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), monies recovered in Court of Claims lawsuits for common law torts could not be subject to § 1983 preemption. This would create a disincentive to fashion § 1983 claims against the State's employees if the claim could also be conceptualized as a respondeat superior tort against the State in the Court of Claims. The very purpose of § 1983 litigation—to hold individuals acting under color of state law responsible for their constitutional torts—would thereby be undermined, a result which Congress could hardly have intended.

■ There also is no basis for plaintiffs' PAMII preemption claim. The PAMII statutory scheme does not clash with the rights afforded by the states to their mentally ill. To the contrary, the underlying purpose of PAMII—the creation of protection and advocacy systems to help assure that the rights of individuals with mental illness are protected—simply complements such rights.

## D. Qualified Immunity Issue

■ The individual defendants, Glover and Tinker, seek FRCP 12(b)(6) dismissal of Rothstein's damage claims on qualified immunity grounds. "Qualified immunity shields officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir.1998) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "A right is clearly established when '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right .... [T]he unlawfulness must be apparent.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "Even where a right is clearly established, an official is entitled to qualified immunity nevertheless if 'it was objectively reasonable for the public official to believe that his acts did not violate th[at] right[ ].'" *Id.* (quoting *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991)). When determining whether a right is clearly established, a district court should look to Supreme Court and Second Circuit precedent. *See Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir.1998). Under "certain circumstances," the absence of such authority "will not preclude a finding that the law was clearly established." *Shabazz v. Coughlin*, 852 F.2d 697, 701 (2d Cir.1988) (citing *Weber v. Dell*, 804 F.2d 796 (2d Cir.1986)) (prison officials not entitled to qualified immunity when Second Circuit had disapproved of prison practice which other circuits had found unconstitutional).

Rothstein alleges that Glover and Tinker knew or should have known, by reason of the district court's decision in Acevedo, and representations by OMH therein agreeing to abide by that decision, that billing Rothstein would violate his constitutional rights. For FRCP 12(b)(6) purposes, the Court must accept these allegations as true, and even in the context of qualified immunity, must read the complaint "liberally, drawing all reasonable inferences in favor of the plaintiff." *See Connell*, 153 F.3d at 80. Under FRCP 12(b)(6), "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bernheim v. Litt*, 79 F.3d 318, 321 (1996) (quotation and citation omitted). This standard "is applied with even greater force where the plaintiff alleges civil rights violations." *Id.* (quotation and citation omitted).

In placing total reliance on *Acevedo*, Rothstein acknowledges that "there is no decisional law of the Supreme Court or Second Circuit dispositive on the practice of assessing indigent patients charges in full." Pl.Mem., at 19. He contends, nonetheless, that the district court's decision in Acevedo should be viewed as clearly establishing the contours of the constitutional law that OMH's agents were bound to follow, and that *Acevedo* should here preclude the defense of qualified immunity because the district court definitively ruled against the very policy that the individual defendants, in their official capacities as Director of OMH's Bureau of Patient Resources (Glover) and Director of OMH's Attorney General Liaison Unity (Tinker), consciously decided to ignore. *See id.*

■ When properly viewed, the qualified immunity issue is not here dependent on a search for higher court authority shaping the contours of the constitutional rights allegedly violated by the individual

defendants. The issue appears to simply be whether, in the absence of contrary authority, these defendants, acting on behalf of the State, could ignore with impunity the clearly enunciated constitutional restrictions imposed upon the State by the district court even when they were not parties to or bound by the underlying proceeding. The Court believes that qualified immunity should not be available to State officials under such circumstances.

The impact of a district court order in the context of qualified immunity has often arisen in the prison setting, where the courts have consistently denied qualified immunity to prison officials who failed to adhere to district court orders safeguarding prisoners' constitutional rights. *See, e.g., Sockwell v. Phelps,* 20 F.3d 187, 192 (5th Cir.1994) (defendants not entitled to qualified immunity for violating court order mandating full integration of prison). In a number of these cases, the prison official was a named party, but for an assortment of reasons chose not to comply with the court order or believed that he was not bound to do so. *See, e.g., Slone v. Herman,* 983 F.2d 107, 110 (8th Cir.1993) ("The correct inquiry is whether [plaintiff] had a clearly established right to be released from prison once [the court's] order became final and nonappealable, not whether [the court's] order was based on clearly established law."); *Jackson v. Mississippi,* 644 F.2d 1142, 1146 (5th Cir.1981) (denying summary judgment on qualified immunity defense when defendants disobeyed district court order proscribing clearly enunciated unconstitutional prison practice); *see also Farid v. Smith,* 850 F.2d 917, 927 (2d Cir.1988) (Kearse, J., concurring) (noting that judgment entered against defendant in case holding prison policies unconstitutional would be impediment to grant of qualified immunity); *but see Salahuddin v. Coughlin,* 781 F.2d 24, 28 (2d Cir.1986) (qualified immunity granted where court order was unclear).

However, in other cases, where the prison official was not a named party, he also was not entitled to qualified immunity in failing to comply with a court order directed at the state when he knew, or should have known, that such an order had been issued, and the official was in a position of responsibility to comply with the order on behalf of the state. *See, e.g., Walters v. Grossheim,* 990 F.2d 381, 384 (8th Cir. 1993) (sophisticated prison officials, who were not named defendants in underlying district court order, not entitled to qualified immunity for disregarding order); *Arce v. Miles,* No. 85 Civ. 5810, 1991 WL 123952, at *11 (S.D.N.Y. June 28, 1991) (denying qualified immunity to official not named in court order which he failed to implement because "[t]o suggest that prison officials could ignore with impunity documents that purport to relate to the law of [cases against the prison] would be to turn the doctrine of qualified immunity on its head"); *Tasker v. Moore,* 738 F.Supp. 1005, 1014 (S.D.W.Va.1990) (governor who interfered with implementation of district court order directed to state prison officials was not protected by qualified immunity, "even though he was not personally named in the orders").

Glover and Tinker do not contend that they could lawfully ignore the reach of *Acevedo* because no higher court has prohibited OMH from billing indigents for the full costs of hospitalization and treatment when filing lawsuits against OMH or its employees. Nor do they contend that they had no reason to believe that *Acevedo's* prohibition against assessing full charges in response to lawsuits filed against the State in the Court of Claims would not also apply with equal force to lawsuits filed against OMH's employees in the State Supreme Court. *See* Dft.Mem., Point 11, at 18–19. Rather, they invoke Siegel as justification for their conduct, contending that "it was objectively reasonable for them to share the belief of State Supreme Court Justice Lebedeff in *Siegel* ..., that the new OMH [counterclaim] practice conforms to the constitutional requirements suggested in Acevedo, ... [and] that the

OMH practice is in fact constitutional." *Id.* at 19. Their contention is unpersuasive since nothing in *Siegel* countermands the holding in *Acevedo,* and Rothstein's litigation has nothing whatsoever to do with counterclaims.

Even if Glover and Tinker would be deemed to have harbored a good faith belief that they could assess full charges in anticipation that a counterclaim would soon thereafter be filed against Rothstein in the Supreme Court, as was the case with Brown's Supreme Court lawsuit, it was certainly not objectively reasonable for them to continue the assessment of charges, as alleged in the complaint, after the counterclaim against Brown was appropriately withdrawn. *See* Complaint ¶ 91. In any event, while their subjective intent may bear upon the ultimate issue of liability, *see Greenwich Citizens Committee,* 77 F.3d at 27–28, 31, it is not relevant in assessing whether their conduct is objectively reasonable. *See Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Moreover, even if it were relevant, it presents an issue of fact which could not be resolved under FRCP 12(b)(6).

Accordingly, since Rothstein has set forth sufficient factual allegations of a constitutional deprivation, and sufficient factual allegations to hold the individual defendants personally accountable for this deprivation, their motion to dismiss on the basis of qualified immunity must be denied. *See Connell,* 153 F.3d at 81–82 (denying defendants' motion to dismiss where plaintiff had set forth sufficient facts to demonstrate that defendants were not entitled to qualified immunity).[15]

## E. Relief Issues

■ Although the Court "So Ordered" the parties' Stipulation certifying that Brown's constitutional challenge to OMH's counterclaim policy could be maintained as a class action, class action certification is no longer relevant in light of the Court's decision not to address this issue. Indeed, district court judges are "required to reassess their class rulings as the case develops." *Boucher v. Syracuse Univ.,* 164 F.3d 113, 118 (2d Cir.1999) (citing *Barnes v. The Am. Tobacco Co.,* 161 F.3d 127, 140 (3d Cir.1998)) (other citation omitted). The Court accordingly decertifies the class.

In regard to the Court's holding that the counterclaim cannot be maintained as a matter of State law, the Court cannot, under Eleventh Amendment jurisprudence, enjoin the State from interposing the counterclaim. Although "the Eleventh Amendment does not bar federal courts from issuing an injunction against a state official who is acting contrary to federal law," *New York City Health & Hospitals Corp. v. Perales,* 50 F.3d 129, 135 (2d Cir.1995) (citing *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 102, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)), "*Pennhurst* made clear that the Eleventh Amendment prevents a federal court from granting injunctive relief against a state official on the basis of state law." *Fleet Bank, Nat'l Ass'n v. Burke,* 160 F.3d 883,

---

15. It may well be that Rothstein will not recover significant monetary damages should he prevail on his liability claims against Glover and Tinker. Although he seeks compensatory and punitive damages, *see* Complaint ¶ 28, each of which are separately available under § 1983, *see Carey v. Piphus,* 435 U.S. 247, 256, 257 n. 11, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *Memphis Community Sch. Dist. v. Stachura,* 477 U.S. 299, 306–07, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986); *Robinson v. Cattaraugus County,* 147 F.3d 153, 162 (2d Cir.1998); *King v. Macri,* 993 F.2d 294, 298 (2d Cir.1993), the prospects for compensatory damages appear remote since he has not withdrawn his lawsuit, and the requisite "evil motive or intent" for punitive damages, *see McCardle v. Haddad,* 131 F.3d 43, 52–53 (1997), would seem to be somewhat problematic. Nonetheless, even though "[r]ecovery may appear remote and unlikely on the face of the pleading … that is not the test for dismissal" under FRCP 12(b)(6). *Bernheim,* 79 F.3d at 321. In any event, Rothstein would at least be entitled to nominal damages if his constitutional rights are found to be violated. *See Carey,* 435 U.S. at 266–67, 98 S.Ct. 1042.

891 (2d Cir.1998). However, as in the present case, "that consequence does not disable a federal court from adjudicating a state law issue, which if resolved in favor of the plaintiff would avoid a constitutional issue...." *Id.* In such a situation, a declaratory judgment is unavoidable. *See id.* n. 6 ("A state law issue that is preliminary to a federal claim against a state official is not a pendent state law claim that Pennhurst prevents a federal court from adjudicating."); *see also Green v. Mansour*, 474 U.S. 64, 72, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985) ("The propriety of issuing a declaratory judgment may depend upon equitable considerations ... and is also 'informed by the teachings and experience concerning the functions and extent of federal judicial power.'" (internal citation omitted)).[16]

## III. CONCLUSION

1. Defendants' motion pursuant to FRCP 12(b)(1) to dismiss the complaint in respect to DeMarco is granted. In respect to the Clinic, the Court declares that the Clinic has standing in both its representational and individual capacities;

2. In respect to the First and Second Causes of Action, the Court does not reach the issue of the constitutionality of OMH's alleged practice of assessing full care and treatment charges in conjunction with the mechanism of a counterclaim up to the full amount of damages sought against it in Court of Claims lawsuits by patients or ex-patients for alleged tortious conduct by OMH employees, because the Court declares that such a counterclaim is contingent on the success of the lawsuits and, as a matter of State law, contingent counterclaims are proscribed;

3. Defendants' motion pursuant to FRCP 12(b)(6) to dismiss the Third and Fourth Causes of Action, asserting the violation of Brown and Rothstein's constitutional rights because they were allegedly assessed full care and treatment charges in retaliation for the filing of their lawsuits in the State Supreme Court, is denied;

4. In respect to the Fifth and Sixth Causes of Action, the Court declares that the collection of care and treatment charges by OMH under Mental Hygiene Law § 43.01 *et seq.* from awards obtained by patients or former patients arising out of the violation of their federal constitutional rights or tortious conduct by OMH or its employees, is not preempted under 42 U.S.C. § 1983 or 42 U.S.C. § 10801 *et seq.;* and

5. In light of the Court's disposition in regard to the First and Second Causes of Action, the class thereunder is decertified.

**SO ORDERED.**

---

**16.** Presumably, Brown and Rothstein will now move in their State lawsuits, if still pending, to dismiss the counterclaims. It will, of course, rest with the State courts to determine, as a matter of State law, whether, under the circumstances of this case, claim or issue preclusion would be applicable. *See, e.g., Tomasello v. Choice Care Long Island*, 229 A.D.2d 527, 528, 646 N.Y.S.2d 136, 138 (2d Dep't 1996) (granting *res judicata* effect to federal judgment of Eastern District of New York); *Glendora v. Kofalt*, 162 Misc.2d 166, 173, 616 N.Y.S.2d 138, 143–44 (N.Y.Sup.Ct., Westchester County, 1994), *as modified,* 224 A.D.2d 485, 637 N.Y.S.2d 780 (2d Dep't 1996) (granting collateral estoppel effect to federal judgment dismissing plaintiff's First Amendment claims); *see also Moore v. Aegon Reins. Co. of Am., Inc.*, 196 A.D.2d 250, 255, 608 N.Y.S.2d 166, 170 (1st Dep't 1994) (federal law delineates scope of federal judgment, while state law determines extent of preclusive effect to be given such judgment).